**Steven SCOTT, Respondent,**

v.

**Robert LeCLERCQ, Appellant.**

**No. WD 61885.**

Missouri Court of Appeals, Western District.

June 15, 2004.

John E. Taylor, Kansas City, MO, Michael W. Blanton, Co–Counsel, Lee's Summit, MO, for appellant.

John Richard Shank, Jr., Kansas City, MO, for respondent.

Before BRECKENRIDGE, P.J., SMITH and HOWARD, JJ.

PATRICIA BRECKENRIDGE, Judge.

Robert LeClercq appeals from a judgment entered against him awarding Steven Scott $50,000 in actual damages and $10,000 in punitive damages on his alienation of affection claim and $100,000 in actual damages and $25,000 in punitive damages on his defamation claim. Mr. LeClercq argues that the trial court erred in (1) striking his answer based on his failure to comply with discovery requests; (2) denying his request for a continuance to enable his new counsel to prepare for trial; (3) denying his request for a jury trial; and (4) awarding damages for defamation because Mr. Scott failed to prove harm to his reputation. While the appeal in this case was pending, the Supreme Court issued its decision in *Helsel v. Noellsch*, 107 S.W.3d 231, 233 (Mo. banc 2003), abolishing the tort of alienation of affection. Because this court finds that *Helsel* applies to this case, the portion of the judgment finding Mr. LeClercq liable for alienation of affection and awarding Mr. Scott actual and punitive damages on this claim is reversed. This court finds no error in the trial court's judgment on the defamation claim and, accordingly, that portion of the judgment is affirmed.

**Factual and Procedural Background**

On October 7, 1998, Mr. Scott filed a petition asserting claims of alienation of affection and defamation against Mr. LeClercq. In the alienation of affection claim, Mr. Scott alleged that Mr. LeClercq had sexual intercourse with Mr. Scott's wife, contributing to the breakdown of Mr. Scott's marriage. In the defamation claim, Mr. Scott alleged, in pertinent part, that Mr. LeClercq sent defamatory e-mail messages to students at the school at which Mr. Scott was the principal stating that Mr. Scott was "pretty unstable," was "harassing everyone [Mrs. Scott] knows," and was "being investigated for harassment and sexual stuff." Mr. Scott also alleged that, in the spring or summer of 1998, Mr. LeClercq published Mr. Scott's name, address, and telephone number on Internet websites catering to homosexuals and stated that Mr. Scott was a homosexual soliciting homosexual relations. Mr. Scott alleged that, as a result, he was contacted by homosexual men seeking a homosexual relationship with him. On both claims, Mr. Scott sought damages in an amount in excess of $25,000, and he sought punitive damages. On November 1, 1999, Mr. Scott mistakenly served the petition on Mr. LeClercq's father, Robert LeClercq, Jr., instead of Mr. LeClercq.

On February 3, 2000, the trial court entered a default judgment against Mr. LeClercq that was later amended on February 16, 2000. The court awarded Mr. Scott $15,227 on his alienation of affection claim; $100,000 in actual damages on his defamation claim; and $50,000 in punitive damages on his defamation claim. After Mr. LeClercq's father moved to have the judgment set aside for lack of personal jurisdiction and improper service, however, the court set aside the default judgment on March 22, 2000.

Mr. LeClercq was personally served almost a year later, on February 14, 2001. After he was granted an extension of time, Mr. LeClercq filed his answer on April 5, 2001. Mr. Scott then served interrogatories and requests for production of documents on Mr. LeClercq. At Mr. LeClercq's request, Mr. Scott agreed to a three-week extension of time to respond to this discovery. On the day before the expiration of the extension, Mr. LeClercq served written objections to the interrogatories and requests for production of documents. Mr. LeClercq objected to thirteen

out of the eighteen interrogatories, and seven out of the ten requests for production of documents. His objections generally were that the discovery requests were vague, overly broad, unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, or requested confidential information concerning Mr. LeClercq's employer at the time of the alleged acts. Mr. LeClercq did not provide answers to the interrogatories and production requests to which he did not object.

In response, Mr. Scott sent Mr. LeClercq a "Golden Rule" letter on August 31, 2001. Mr. Scott pointed out that Mr. LeClercq had failed to answer or object to five of the interrogatories and three of the production requests. Mr. Scott also offered to protect any confidential information contained in any of the documents requested and addressed the other objections. After Mr. LeClercq failed to respond to the "Golden Rule" letter, Mr. Scott filed a motion to compel discovery. On November 7, 2001, Mr. LeClercq then responded to the five interrogatories and three production requests that he had not addressed in his objections, and provided responses to only some of the thirteen interrogatories and seven productions requests to which he had previously objected.

On December 13, 2001, the trial court considered Mr. Scott's motion to compel and ordered Mr. LeClercq's answer stricken for failure to respond to discovery. The court also stated that "[i]t is apparent that [Mr. LeClercq] is intentionally delaying the litigation, which has been pending for years." The court then set a date for a default hearing.

On the day of the default hearing, January 10, 2002, the trial court set aside its order striking Mr. LeClercq's answer and ordered the parties to attempt to resolve their discovery disputes and return to court with any remaining objections. The trial court also ordered Mr. LeClercq to appear in Kansas City for his deposition.

Over two months later, Mr. LeClercq provided supplemental answers to the interrogatories. He failed to sign his supplemental answers, however, as required by Rule 57.01. In his supplemental answers, he provided some of the information requested but refused to provide information concerning his current spouse, his current employer, or his residence. He also refused to provide documents requested, such as his credit card and bank statements from 1996 through 1999, and documents showing his net worth. Mr. Scott wrote a second "Golden Rule" letter in which he asserted that the supplemental responses and stated objections were not made in good faith and that one of the objections Mr. LeClercq repeatedly relied upon, that he was refusing to answer certain questions and provide certain documents "given the nature and extent of the claims between the parties," was not a legally valid objection.

Thereafter, Mr. Scott filed a second motion to compel. The court held a hearing on the motion on May 2, 2002. The court sustained the motion to compel, ordered that the scope of certain interrogatory questions be narrowed, and that Mr. LeClercq answer those questions by May 21, 2002. The court also ordered Mr. LeClercq to execute authorizations relating to an e-mail account and to sign his supplemental answers to interrogatories. The court warned Mr. LeClercq that his failure to appear for his deposition without "an unbelievably compelling reason" would result in the court striking his answer again. Mr. LeClercq was also ordered to pay Mr. Scott $350 in attorney's fees. The court set the case for trial on July 15, 2002.

Mr. LeClercq's deposition was scheduled for May 28, 2002, at his request. Six days before the deposition, however, Mr. LeClercq requested a protective order postponing his deposition based on his representation that his wife was scheduled to have had Caesarian-section surgery "on or about May 21, 2002," seven days before the deposition, and would require his care on the date of the deposition. Mr. Scott did not agree to a postponement, and the trial court refused to issue the protective order postponing the deposition. Mr. LeClercq also requested the trial be continued beyond the July 15, 2002 trial date based upon his representation that he would be out of the country at that time. The trial court denied his request.

On May 28, 2002, Mr. LeClercq appeared for his deposition, which started at 10:15 A.M., and answered questions until 2:20 P.M. At that time, he announced that he was leaving to catch a 4:00 P.M. flight to return to Chicago to care for his wife, their newborn child, and their two other young children. Mr. Scott's counsel objected to Mr. LeClercq's departure because he had not completed the deposition, but Mr. LeClercq left anyway.

Because of Mr. LeClercq's conduct during the deposition, Mr. Scott filed a motion to strike Mr. LeClercq's answer and enter a default judgment. On July 3, 2002, the trial court struck Mr. LeClercq's answer and entered an interlocutory order for Mr. Scott. On July 15, 2002, Mr. LeClercq did not appear in person. His counsel appeared, and said Mr. LeClercq was in the country, but was ill. His counsel also said that communication with Mr. LeClercq had broken down and asked for leave to withdraw. Mr. LeClercq's counsel was permitted to withdraw, and the trial was continued to July 25, 2002. On that date, new counsel for Mr. LeClercq appeared and requested that the trial court set aside its interlocutory order. He also filed a demand for a jury trial and a motion requesting that the trial date be continued for fourteen additional days to allow him time to prepare. In the continuance motion, Mr. LeClercq's new counsel stated that he was retained two days before trial and had obtained the file the day before trial.

The trial court denied Mr. LeClercq's motions and held a hearing on the issue of damages. Following the hearing, the court entered its judgment awarding Mr. Scott $50,000 in actual damages and $10,000 in punitive damages on his alienation of affection claim, and $100,000 in actual damages and $25,000 in punitive damages on his defamation claim. The trial court denied Mr. LeClercq's motion for reconsideration or new trial. This appeal followed.

## Standard of Review

This court's review of the trial court's judgment is governed by the principles of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). This court will affirm the decision of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 32.

## Abolition of Alienation of Affection Action Applies Retrospectively

While this appeal was pending, the Supreme Court handed down its decision in *Helsel*, abolishing the tort of alienation of affection. 107 S.W.3d at 233. This court received supplemental briefs from the parties regarding the application of *Helsel* to this case. Mr. LeClercq cites cases holding that where, as in *Helsel*, the decision is silent regarding the application of the new law to pending cases, the new law should be applied retrospectively because the case

changed substantive, as opposed to procedural, law. Mr. Scott argues that *Helsel* does not apply retrospectively because Mr. LeClercq did not challenge the alienation of affection count at trial and, hence, did not preserve the issue on appeal. Mr. Scott also argues that the judgment on his alienation of affection claim should not be reversed because the court would have entered the default judgment as a discovery sanction regardless of what the underlying claim was.

In *Sumners v. Sumners,* 701 S.W.2d 720, 724 (Mo. banc 1985), the Supreme Court adopted a three-factor test to determine whether a decision changing substantive law should be given prospective-only effect. First, the decision " 'must establish a new principle of law … by overruling clear past precedent.' " *Id.* (quoting *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971)). Second, the court "must determine whether the purpose and effect of the newly announced rule will be enhanced or retarded by retrospective operation." *Id.* Third, the court weighs the interests of those affected by the change in the law:

> [T]he [c]ourt must balance the interests of those who may be affected by the change in the law, weighing the degree to which parties may have relied upon the old rule and the hardship that might result to those parties from the retrospective operation of the new rule against the possible hardship to those parties who would be denied the benefit of the new rule.

*Id.*

Applying this test, on the first factor, the decision in *Helsel* unquestionably establishes a new principle of law, as there no longer exists an action for alienation of affection in Missouri. The second factor, whether the purpose and effect of the newly-announced rule will be enhanced or retarded by retrospective effect, militates in favor of retroactivity. The Court in *Helsel* found that the tort of alienation of affection was based on the antiquated concept that a husband has a proprietary interest in his wife and her services and on the faulty assumption that the cause of action preserves marriages and protects families. 107 S.W.2d at 232. The Court found that "[t]he tort of alienation of affection can no longer be adequately justified" on these bases, and that abolishing it would be consistent with the Court's prior abolition of the tort of criminal conversation. *Id.* at 233. The application of *Helsel* to pending cases enhances the purpose and effect of the newly-announced rule, which is to do away with an antiquated cause of action that is no longer justifiable on legal or moral bases.

The third factor of the test, a comparison of the parties' interests affected by the change, their reliance on the prior law, and the relative hardship on the parties by retrospective application of the new law, also weighs in favor of the retrospective application of *Helsel.* Mr. Scott did not rely on pre-*Helsel* law. "Reliance 'bespeaks a voluntary choice of conduct by the person harmed. It infers that the person exercising it can decide between available alternatives.' " *Sumners,* 701 S.W.2d at 724 (citation omitted). There were no alternative causes of action from which Mr. Scott could have chosen to obtain a remedy for Mr. LeClercq's conduct of purposely interfering with Mr. Scott's marriage relationship and contributing to the breakdown of Mr. Scott's marriage. Thus, rather than make a voluntary choice, Mr. Scott merely availed himself of what has since been determined to be an outmoded cause of action.

Mr. Scott has not directed this court to any cases limiting the retrospective application of new law on the facts existing in

this case. Rather, he relies on cases in which the Supreme Court *specifically* limited the application to pending cases in which the issue had been preserved. Nor has Mr. Scott cited any cases denying retrospective application to default judgments that were entered after a defendant's answer had been struck as a sanction for discovery violations. Based on the purpose for the change in the law and balancing its effect on the parties, this court finds that *Helsel* should be applied retrospectively. Accordingly, the judgment finding Mr. LeClercq liable for alienation of affection and awarding Mr. Scott actual and punitive damages on this claim is reversed.

### No Abuse of Discretion in Striking Answer

In his first point, Mr. LeClercq argues that the trial court erred in striking his answer as a sanction for discovery violations. Subsections (b), (d), and (f) of Rule 61.01 expressly authorize the trial court to strike pleadings and enter a judgment by default as sanctions for failure to comply with discovery requests. This court's review of the trial court's imposition of sanctions is limited to determining whether the action taken amounted to an abuse of discretion. *Eidson ex rel. Webster v. Eidson*, 7 S.W.3d 495, 499 (Mo.App. 1999). Judicial discretion is abused only "when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Green v. Fleishman*, 882 S.W.2d 219, 223 (Mo.App.1994). "[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.* The sole task of this court "is to determine whether the trial court could have reasonably concluded as

it did, and not whether this court would have imposed the same sanctions under the same circumstances." *Eidson*, 7 S.W.3d at 499.

An order striking a party's pleadings is justified where the record shows a pattern of repeated disregard of the obligation to comply with discovery. *Dobbs v. Dobbs Tire & Auto Ctrs., Inc.*, 969 S.W.2d 894, 899 (Mo.App.1998). The record shows such a pattern in this case. After Mr. Scott agreed to a three-week extension of time to respond to discovery, Mr. LeClercq responded by objecting to thirteen out of eighteen interrogatories and seven out of ten requests for production of documents, and by failing to answer the few interrogatories and production requests to which he did not object. Mr. LeClercq ignored Mr. Scott's subsequent "Golden Rule" letter. It was only after Mr. Scott filed a motion to compel that Mr. LeClercq then provided incomplete responses to some of the interrogatories and production requests. In its December 13, 2001, order striking Mr. LeClercq's answer for the first time, the court found that Mr. LeClercq was intentionally delaying the litigation by failing to respond to discovery.

Although the trial court set aside this order one month later, the order should have served as notice to Mr. LeClercq that any further lack of cooperation on his part would not be tolerated. Yet, in his supplemental interrogatory answers, which he provided over two months later and failed to sign, Mr. LeClercq again refused to provide basic discoverable information, such as his current address, the name and address of his current spouse, and the name and address of his current employer. He also refused to provide discoverable documents, including his credit card and bank statements from 1996 through 1999,

and documents showing his net worth. The objection upon which Mr. LeClercq frequently relied was that he was refusing to answer certain questions and provide documents "given the nature and extent of the claims between the parties." The proper method to raise such an objection to discovery, however, would have been to file a motion for a protective order under Rule 56.01(c). Mr. Scott sent a second "Golden Rule" letter to Mr. LeClercq and eventually filed a second motion to compel. The court held a hearing on the second motion to compel and sustained the motion. At the hearing, the court warned the defendant that his failure to show up at his deposition without "an unbelievably compelling reason" would result in the striking of his pleadings.

Despite this warning, and despite the fact that the deposition was scheduled on May 28, 2002, *at Mr. LeClercq's request,* Mr. LeClercq attempted to postpone the deposition because his wife was scheduled to have a Caesarian-section seven days before the deposition. The court denied his motion for a protective order postponing the deposition, which should have indicated to Mr. LeClercq that he was required to be at his deposition and available to answer Mr. Scott's questions.

During the deposition, Mr. LeClercq gave vague or evasive answers to many questions. For example, when asked about his alleged conflict with the July 15, 2002, trial date, Mr. LeClercq stated that he was to be out of the country, speaking at a conference that started on July 6 or 7 and lasted seven or eight days. He thought the conference was in Prague, but he was not sure, and he was unsure which organization was sponsoring the conference and on what day he would be speaking. Also, when asked the value of his house, Mr. LeClercq could not even give an estimate, despite the fact that he had

refinanced his house just one year before. Mr. LeClercq did not know what he paid for the house five years ago when he bought it. Similarly, Mr. LeClercq was unable to verify the amount of his income for previous years, even though Mr. Scott had obtained Mr. LeClercq's W–2 forms from another source. Mr. LeClercq was also unable to testify to the amount of his monthly house payment, despite the fact that he wrote the check each month. Mr. LeClercq was only able to estimate the amount of the payment after Mr. Scott's attorney stated that he would depose Mr. LeClercq's wife, who was unaware of the lawsuit, to obtain such information.

Mr. LeClercq also stated during his deposition that he could not remember any of the screen names he used during the three years that America Online was his Internet provider. Even after he was confronted with America Online's records showing what his screen names were during the three years, he stated that he did not recall using those names. Additionally, while Mr. LeClercq testified that his former employer, Merrill Lynch, was paying his attorney's fees in the action, he also testified that he did not know why they were doing so. The trial court could have reasonably found Mr. LeClercq's evasive and vague answers unbelievable.

Moreover, Mr. LeClercq left his deposition early, after announcing that he had a flight to catch. He claimed that his wife had had a Caesarian-section surgery six days earlier and required his care. The trial court was not compelled to find Mr. LeClercq's explanation credible or reasonable. Mr. LeClercq's contention that he complied with the court's order by appearing at the deposition is disingenuous. Mr. LeClercq was required not only to show up for the deposition but also to remain until Mr. Scott's counsel completed his interrogation. *See Fredco Realty, Inc. v.*

*Jones,* 906 S.W.2d 818, 820–21 (Mo.App. 1995). Mr. LeClercq's unexcused departure from the deposition violated the terms of the notice of deposition and made him subject to sanctions under Rule 61.01(f). Based on the record of Mr. LeClercq's responses to discovery, as well as his unexcused departure from his deposition, the trial court did not abuse its discretion by striking Mr. LeClercq's answer. Mr. LeClercq's first point is denied.

## No Error in Denying Continuance Request

In his second point, Mr. LeClercq argues that the trial court erred in denying his request for a continuance. This case was originally set for trial on July 15, 2002. On that day, Mr. LeClercq's original trial counsel withdrew on the basis of a breakdown in communication with Mr. LeClercq, and the trial court continued the case to July 25, 2002. On July 25, 2002, new counsel entered his appearance and filed a motion for a continuance. He advised the court that he had just received the file from prior counsel the previous day. The trial court denied the continuance motion.

The decision to deny a continuance motion will not be reversed unless the trial court abused its discretion. *Bydalek v. Brines,* 29 S.W.3d 848, 855 (Mo.App. 2000). The procedure for requesting a continuance is contained in Rule 65. Rule 65.03 requires that an application for continuance be accompanied by "the affidavit of the applicant or some other credible person setting forth the facts upon which the application is based, unless the adverse party consents that the application for continuance may be made orally." Mr. LeClercq's written motion was not accompanied by an affidavit, and Mr. Scott did not consent to an oral affidavit. Because Mr. LeClercq did not comply with Rule 65.03,

the trial court was not required to grant the relief requested. *Bydalek,* 29 S.W.3d at 855–56.

Mr. LeClercq's non-compliance with Rule 65.03 is sufficient, in and of itself, to uphold the denial of his continuance motion. *Id.* at 856. Nevertheless, there are other factors that support the denial. *Id.* Mr. LeClercq failed to appear on July 15, 2002, which was the first date the case was specially set for trial. Mr. LeClercq claimed he would be out of the country on that date and could not appear at trial for that reason. Yet, his counsel appeared and explained that Mr. LeClercq was "unexpectedly" required to return early and was, in fact, in the country. At that time, Mr. LeClercq's original counsel requested leave to withdraw due to a breakdown in communication with Mr. LeClercq. Counsel explained that Mr. LeClercq did not respond appropriately to their correspondence and was acting as though he had not received their correspondence. The court permitted counsel to withdraw and reset the trial to July 25, 2002, to give Mr. LeClercq the opportunity to retain new counsel to prepare for a trial on damages on that date.

The record indicates that Mr. LeClercq contacted his new counsel the week before the July 25, 2002 trial, but his new counsel did not get the file until two days before trial and did not enter his appearance until the day of the trial. His new counsel explained that he waited to enter his appearance until he had taken the "right steps to get the appropriate things done" and had received the file from Mr. LeClercq's original counsel. While the actions of Mr. LeClercq's new counsel may have been professionally reasonable under most circumstances, time was of the essence in this case, considering Mr. LeClercq's prior conduct. In light of Mr. LeClercq's history of delaying resolution

of the case, this court cannot say that the trial court abused its discretion in denying the motion for a continuance. Mr. LeClercq's second point is denied.

### No Error In Denying Motion For a Jury Trial

■ In his third point, Mr. LeClercq alleges the court erred in denying his motion for a jury trial. Mr. LeClercq's argument is premised on his belief that the trial court struck his answer under Rule 61.01 and entered an interlocutory order of default under Rule 74.05(b).[1] Therefore, he contends, the court should have granted his request for a jury trial on the issue of damages. Rule 74.05 does not apply, however, when a party's answer is struck and a default judgment is rendered because of a discovery sanction. *Simpkins v. Ryder Freight Sys., Inc.*, 855 S.W.2d 416, 420 (Mo.App.1993). The default rule does not apply because the judgment " 'does not come by default in the ordinary sense,' " as in a failure to plead or otherwise defend, but instead " 'is treated as a judgment upon trial by the court.' " *Id.* (citations omitted). Contrary to Mr. LeClercq's contention, the trial court entered judgment for Mr. Scott as a part of its sanction under Rule 61.01, not Rule 74.05(b).

■ In his reply brief, Mr. LeClercq asserts for the first time that the denial of his demand for a jury trial violated his rights under the Missouri Constitution, Missouri statutes, and the Missouri Rules of Civil Procedure. Because Mr. LeClercq failed to present his constitutional claim to the trial court, however, it is not preserved. *Weiss v. Rojanasathit*, 975 S.W.2d 113, 121 (Mo. banc 1998). Constitutional issues must be raised at the earliest opportunity, or else they are waived. *Id.* The other claims raised in his reply brief are also waived. "Points and arguments omitted from an appellant's initial brief may not be supplied by a reply brief, when the respondent has no chance to reply." *Knopke v. Knopke*, 837 S.W.2d 907, 923 (Mo.App.1992). Mr. LeClercq's third point is denied.

### Sufficient Evidence of Damage to Reputation

■ In his final point, Mr. LeClercq contends that the trial court erred in awarding Mr. Scott damages on his defamation claim because Mr. Scott did not prove that he suffered harm to his reputation. Mr. Scott first argues that he was not required to prove that he was damaged because damage to his reputation was an element of his defamation claim that was found in his favor when the court entered its default judgment under Rule 61.01. It is true that the default judgment under Rule 61.01 is treated as a judgment establishing Mr. LeClercq's liability after a trial by the court. *See Simpkins*, 855 S.W.2d at 420. The default judgment did not, however, establish his entitlement to actual damages. *See id.* at 423.[2]

■ To be entitled to actual damages for defamation, a plaintiff must pro-

---

1. Rule 74.05(b) provides:

 When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules, an interlocutory order of default may be entered against that party. After entry of an interlocutory order of default, a default judgment may be entered. Any party may demand a jury to assess damages. If a jury is not demanded, the court shall assess any damages.

2. Because this court finds, as discussed below, that Mr. Scott presented sufficient evidence of actual reputational harm, this court need not decide whether Mr. Scott would have been entitled to nominal damages based solely upon the entry of the default judgment establishing Mr. LeClercq's liability.

vide proof of "actual reputational damage." *Kenney v. Wal–Mart Stores, Inc.*, 100 S.W.3d 809, 814 (Mo. banc 2003). Once the plaintiff establishes damage to reputation, the plaintiff can also recover for other related injuries, such as emotional distress. *Id.* at 813.

In *Kenney*, the Supreme Court discussed the sufficiency of proof of actual reputational harm. Specifically, the Court examined cases, from Missouri and other jurisdictions, in which the proof of actual harm to reputation was insufficient. *Id.* at 814–17. In one of the Missouri cases cited, *Bauer v. Ribaudo*, 975 S.W.2d 180, 181–82 (Mo.App.1997), the court held that the plaintiff, a candidate for state representative who alleged his opponent had defamed him in a television commercial, had not presented sufficient evidence of reputational harm because he failed to name one person who changed his vote or did not vote for him as a result of the commercial, and he failed to present any evidence of his standing in the polls before and after the commercial aired. Likewise, in *Taylor v. Chapman*, 927 S.W.2d 542, 544–45 (Mo.App.1996), another Missouri case cited in *Kenney*, the plaintiff's testimony that "her integrity had been tarnished" and that "[p]eople lose their trust in the person that is supposed to be managing their building," without any supporting evidence or testimony, was insufficient to establish reputational harm.

Like the plaintiffs in *Bauer* and *Taylor*, the plaintiff in *Rocci v. MacDonald–Cartier*, 323 N.J.Super. 18, 731 A.2d 1205 (1999), a New Jersey case cited by the Court in *Kenney*, also failed to prove actual injury to reputation because "no 'single person came forward to state that plaintiff's reputation had been besmirched' by the allegedly defamatory letter." *Kenney*,

100 S.W.3d at 816 (quoting *Rocci*, 323 N.J.Super. at 25, 731 A.2d at 1209). The Court in *Kenney* cited a passage from *Rocci* that discussed proof of actual injury to reputation:

"Injury to reputation, even more so than personal injury or mental anguish, which are both amenable to expert testimony, defies exact measurement.... Accordingly, a plaintiff should offer some concrete proof that his reputation has been injured. One form of proof is that an existing relationship has been seriously disrupted, reflecting the idea that a reputation may be valued in terms of relationships with others. Testimony of third parties as to a diminished reputation will also suffice to prove 'actual injury.' *Awards based on a plaintiff's testimony alone or on 'inferred' damages are unacceptable.*"

*Id.* (quoting *Rocci*, 323 N.J.Super. at 23–24, 731 A.2d at 1208 (citation omitted)).

Comparing the evidence of injury to reputation presented in these cases and others to the evidence presented in its case, the Court in *Kenney* noted that the plaintiff "made only a conclusory statement that her reputation was injured and that she felt 'embarrassed, shocked, mad' " because of the allegedly defamatory statement. *Id.* at 817. The plaintiff "did not name a single person who held her in lower regard ... [n]or did she present anyone who respected her less or thought of her reputation as being lowered" by the allegedly defamatory statement. *Id.*

 In this case, Mr. Scott alleged that he suffered harm to his reputation from statements Mr. LeClercq made in an Internet chat room conversation[3] with a girl who was a seventh or eighth grade student in the same school district where

---

**3.** Although the parties refer to the defamatory statements as having been made in an e-mail, the evidence indicates that the statements were made in a chat room conversation.

Mr. Scott was the high school principal. During the conversation, Mr. LeClercq posed as a private detective and asked the girl whether she had any brothers or sisters that went to the high school where Mr. Scott was the principal. When the girl replied that her sister went to the high school, Mr. LeClercq stated that Mr. Scott was "being investigated for harassment and sexual stuff." Mr. LeClercq also asked the girl to ask her sister whether Mr. Scott "ever made any advances to her," and then said that Mr. Scott was "a weird dude, according to reports." Mr. LeClercq elaborated on that, stating that Mr. Scott was "dovorcing [sic] his wife, and is pretty unstable ... harassing everyone she knows, accusing them of sleeping with her." He then told the girl to "just be careful ... Steve [sic] Scott ... remember his name, ok?"

The girl printed the chat room conversation and showed it to her mother. The girl's mother discussed it with her husband and then went to Mr. Scott's office the next day to ask Mr. Scott about it.[4] The girl's mother was "very concerned" and was unsure if there was any truth to the statements Mr. LeClercq made in the chat room conversation. Mr. Scott was "extremely embarrassed" and "upset" when he saw the chat room conversation. After speaking with the girl's mother, Mr. Scott took the printout of the chat room conversation and reported it to Dr. Paul James, who was the superintendent of the school district.

Mr. Scott offered portions of Dr. James' deposition testimony into evidence during the trial on damages. Specifically, Mr. Scott offered Dr. James' testimony as to whether it was the general practice for a principal to report things of this nature to the superintendent:

> I think it would be an important practice for a person who is in a position of high school principal to let his superintendent of schools know of something like that.

> It is a business where you really live and die on your credibility. That's really all you have is your professional reputation and how the public perceives you and how the board of education perceives you. And if there is a rumor of that nature out there and it isn't true I think it would be normal for that to be reported.

Dr. James further testified that other school officials were made aware of the allegations made in the chat room conversation. When asked whether he perceived Mr. Scott's reputation to have been damaged because of the chat room conversation, Dr. James replied affirmatively, and explained:

> Well, I think his reputation was damaged as a result of the e-mail. In my eyes it was not, but I think professionally it was damaged.

> I don't think in a business where all you have is your credibility that you can have people making statements like that. Someone will believe it. When you tell a large number of people something like that some choose to believe it. Some do not.

> That's the nature of our business, and to maintain credibility with the people with whom we work is key to maintaining a successful position I guess.

Unlike in *Kenney, Bauer, Taylor*, and *Rocci*, the record here contains the testi-

---

4. In fact, the girl's mother also spoke with the parent of another student at Mr. Scott's high school about the chat room conversation. When the other parent asked Mr. Scott about the conversation, Mr. Scott was "extremely embarrassed" to have to explain to him what was happening.

mony of a third party who testified that Mr. Scott's reputation had been damaged by the defamatory statement. *See Kenney,* 100 S.W.3d at 817; *Rocci,* 731 A.2d at 1208. The third party in this case, Dr. James, was not only in the field of education, but was one of Mr. Scott's supervisors. Dr. James' testimony about the importance of reputation in the field of education and his belief that Mr. Scott's professional reputation had, in fact, been damaged by Mr. LeClercq's false statements in the chat room conversation was sufficient to support Mr. Scott's assertion that he was damaged.[5] Mr. LeClercq's fourth point is denied.

Because the Supreme Court's abolition of the tort of alienation of affection applies retrospectively, the portion of the judgment finding Mr. LeClercq liable and awarding Mr. Scott actual and punitive damages for alienation of affection is reversed. The judgment on the defamation claim is affirmed.

All concur.

---

5. Evidence of the chat room conversation was sufficient to support a finding of actual reputational harm entitling Mr. Scott to damages. Therefore, this court need not decide whether Mr. LeClercq's publishing Mr. Scott's name, address, and telephone number on websites catering to homosexuals and stating that Mr. Scott was a homosexual soliciting sexual relationships with other men, which resulted in Mr. Scott's receiving solicitations from men who had seen this information on the websites, constituted evidence of actual reputational harm.