# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2185
_____

James Turntine; Promotional Services, Inc.

*Plaintiffs - Appellants*

v.

Charles Peterson; Redeye Rhino, L.L.C.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 10, 2020
Filed: May 18, 2020

_____

Before GRUENDER, ARNOLD, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

James Turntine and Promotional Services, Inc., d/b/a Partners Promoting Darts ("Promotional Services") (collectively, "Plaintiffs") appeal the district court's dismissal of their complaint bringing three defamation counts against Charles Peterson and RedEye Rhino L.L.C. ("RedEye Rhino") (collectively, "Defendants"). We reverse.

**I.**

The following facts are drawn from Plaintiffs' complaint. *See Vigeant v. Meek*, 953 F.3d 1022, 1025 (8th Cir. 2020).

Turntine, a Missouri resident, is the owner and president of Promotional Services, a Missouri corporation with its principal place of business in Missouri, which is a governing body for the sport of darts. Promotional Services also operates a darts league and stages an annual darts competition in the Kansas City, Missouri area called the "Tournament of Champions" ("Tournament"). Peterson, a Minnesota resident, is the managing member of RedEye Rhino, a Minnesota LLC with its principal place of business in Minnesota, which sells darts-themed apparel and produces darts-related videos. RedEye Rhino has a Facebook page that it uses to promote its business. Defendants also have a Facebook page under the "Charles RER" moniker used primarily to promote RedEye Rhino.

Promotional Services and RedEye Rhino entered into a contract under which Promotional Services granted RedEye Rhino the right to be the exclusive jersey provider for its league in 2015 and for the 2015 Tournament. As part of this contract, Promotional Services sold RedEye Rhino $7,500 worth of vouchers that entitled the holder to participate in the 2015 Tournament. The intent behind this transaction was to allow RedEye Rhino to offer these vouchers as prizes at darts competitions it sponsored. The parties "understood and agreed at the time of purchase that RedEye Rhino was required to award the vouchers, if at all, prior to the beginning of registration for the 2015 Tournament." RedEye Rhino did not award all of these vouchers in time, but, "as a gesture of goodwill," Promotional Services bought back $2,500 worth of vouchers.

In 2016, Promotional Services implemented a new apparel rule for its Tournament, prohibiting players from wearing brands (such as RedEye Rhino) unless the brand made a $500 donation to the National Pediatric Cancer Foundation. Promotional Services then informed RedEye Rhino that it would not be given the

right to be the exclusive jersey provider for the 2016 Tournament, and RedEye Rhino declined to make the required donation. Turntine nevertheless donated on RedEye Rhino's behalf so that Tournament participants could still wear RedEye Rhino apparel. Peterson then published a number of Facebook posts disparaging Turntine and Promotional Services. After these posts, Promotional Services banned RedEye Rhino from participating in any Promotional Services' events following the 2016 Tournament.

Roughly two years later, RedEye Rhino posted to Facebook a photo taken at the 2018 Tournament featuring two players whom it sponsored. When Turntine learned of this, he asked the players to have the photo removed. Subsequently, Defendants posted to the Charles RER Facebook page comments criticizing Turntine over their business dealings back in 2015. Turntine responded by posting a statement in a Facebook group hosted by Promotional Services, recounting the parties' past business dealings and explaining why their business relationship soured. In reply, Peterson posted to Defendants' Facebook accounts multiple statements—some written and others verbal—that are the subject of this lawsuit.

First, on October 30, 2018, Defendants posted to RedEye Rhino's Facebook page (and later to his own Facebook page) the following statement: "There is only one league that manipulates, lies and censors its players. 'Charles RER' C.E.O. of RedEye Rhino speaks up about the recent attacks from Jim Turntine of the [Tournament of Champions] League." That statement along with a video contained in the same post indicated that Peterson would be broadcasting a video in November 2018 to address Turntine's statements.

Second, on November 18, 2018, Defendants posted a video to the Charles RER Facebook page. In it, Peterson accused Turntine of "selfishness" and "greed" and claimed that Turntine had engaged in underhanded business practices in 2015 by selling Peterson vouchers for Peterson to redistribute and then actively interfering with Peterson's ability to redistribute them.

Third, in the comments section of that video post, Peterson responded to three different individuals who had asked questions.  One asked, "I know you've said that Turntine is a liar, but did he actually like [sic] to you or do you just not like the guy?"  Peterson replied, "Yes he has lied about this situation to manipulate it."  Another asked, "[W]hat do you mean Jim turntine lies?  I don't want to be involved in a league that lies to it's [sic] players."  Peterson replied, "He has lied about what he has been saying about me to manipulate the situation."  A third person asked, "Jim said on Facebook that this all started when you refused to make the charity donatiin [sic]- is that true?"  Peterson replied, "NO!  We refused to be a part of [the Tournament] because I didn't like how he does his business and I knew the bs that was to come.  Jim uses the Pedatric [sic] Foundation donation to gain sympathy from people about what went don't [sic].  it's [sic] a complete lie."

A few weeks later, Turntine and Promotional Services sued Peterson and RedEye Rhino in Missouri state court, bringing two counts for libel and one count for slander and seeking "in excess of $20,000.00" for each count as well as punitive damages under each count "in an amount that will be sufficient to deter Defendants from engaging in similar misconduct in the future."  Defendants then removed the action to federal court on diversity jurisdiction grounds and moved to dismiss all counts for lack of personal jurisdiction and for failure to state a claim.

The district court granted this motion, agreeing that the complaint failed to state a claim because the statements in question were not actionable under Missouri law.  *See Turntine v. Peterson*, No. 4:19-CV-107 RLW, 2019 WL 2076047 (E.D. Mo. May 10, 2019).  Plaintiffs appeal, arguing that the district court misapplied Missouri law in dismissing each count of their complaint.

## II.

Before proceeding to the merits, we must first determine whether the district court had subject-matter jurisdiction over this action.  *Mensah v. Owners Ins.*, 951 F.3d 941, 942 (8th Cir. 2020) (per curiam).  Defendants removed this case from

-4-

Missouri state court to federal court on the basis of diversity jurisdiction, and Plaintiffs' three state-law defamation claims do not appear to require "resolution of a substantial, disputed federal question" so as to implicate federal-question jurisdiction. *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009). As such, subject-matter jurisdiction exists here only if the requirements of diversity jurisdiction are met. We review *de novo* the question whether diversity jurisdiction exists. *Mensah*, 951 F.3d at 943.

Diversity jurisdiction has two requirements: complete diversity of citizenship of the adverse parties, *see Lee v. Airgas-Mid South, Inc.*, 793 F.3d 894, 899 (8th Cir. 2015) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806)), and an amount in controversy exceeding $75,000, 28 U.S.C. § 1332(a). In this case, the first requirement is met. Plaintiffs are both citizens of Missouri and only Missouri, and Defendants are both citizens of Minnesota and only Minnesota.

Whether the amount-in-controversy requirement is satisfied, however, is a closer question. For each of Plaintiffs' three defamation counts, they pleaded actual damages "in excess of $20,000" as well as "punitive damages" in an unspecified amount "sufficient to deter Defendants from engaging in similar misconduct in the future." Because it was unclear to us from this pleading that the amount in controversy—"in excess of" $60,000[1] plus punitive damages—exceeded $75,000,

---

[1]The damages sought by a single plaintiff via two or more claims against a single defendant may be aggregated for purposes of calculating the amount in controversy. *Spears v. Robinson*, 431 F.2d 1089, 1093 (8th Cir. 1970). Applying that rule here, the aggregated damages sought by either plaintiff against either defendant is "in excess of" $60,000. We thus consider "in excess of" $60,000 the operative amount in controversy.

It is possible that the claims of each plaintiff against one of the defendants could be aggregated, totaling "in excess of" $120,000, which would remove any doubt about satisfaction of the amount-in-controversy requirement. *See Snyder v. Harris*, 394 U.S. 332, 335 (1969) (noting that the claims of "two or more plaintiffs" may be aggregated when they "unite to enforce a single title or right in which they have a common and undivided interest"). But this "common and undivided interest"

*see Schubert v. Auto Owners Ins.*, 649 F.3d 817, 822 (8th Cir. 2011) ("The general federal rule has long been to decide what the amount in controversy is from the complaint itself . . . ."), we raised the matter at oral argument and then ordered supplemental briefing. *See Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019) (noting our "independent obligation to assure ourselves of subject-matter jurisdiction, even when no party raises the issue").

After further consideration, we conclude that the pleaded actual damages are sufficient to satisfy the amount-in-controversy requirement. Critically here, "the complaint does not limit its request for damages to a precise monetary amount." *See Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir. 1993). Rather, Plaintiffs have pleaded *in excess of* $60,000. When damages are pleaded in this way, "the amount in controversy is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." *Id.*

This approach comports with the law of our circuit. The amount-in-controversy requirement may be satisfied even when "the complaint alleges no specific amount of damages or an amount under the jurisdictional minimum." *See In re Minn. Mut. Life Ins. Co. Sales Practices Litig.*, 346 F.3d 830, 834 (8th Cir. 2003). And we measure the amount in controversy "by the value to the plaintiff of the right sought to be enforced" when the amount is in question. *Am. Family Mut. Ins. v. Vein Ctrs. for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019).

Granted, we cannot assume the amount-in-controversy requirement is satisfied in these circumstances. Rather, as the proponent of federal jurisdiction, the removing party "bears the burden of proving that the jurisdictional threshold is satisfied." *Bell v. Hershey Co.*, 557 F.3d 953, 956 (8th Cir. 2009). The "relevant

---

test has been the subject of "pervasive criticism" to the effect that it is "arcane," unclear, and "mystifying." *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 719 (7th Cir. 2012). Given these criticisms coupled with the fact this issue has not been briefed, we decline to find the amount-in-controversy requirement met on this basis.

jurisdictional fact" the removing party must prove here is "whether a fact finder might legally conclude" that "the damages are greater than the requisite amount." *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002).  The removing party must prove this fact by a preponderance of the evidence.  *Bell*, 557 F.3d at 956.

Once the removing party carries its burden, "remand is only appropriate if the plaintiff can establish to a legal certainty that the claim is for less than the requisite amount."  *Id.*  To meet this "legal certainty" standard, the plaintiff must show that the jurisdictional amount could not be recovered "as a matter of law" or that "no reasonable jury could award damages totaling more than $75,000 in the circumstances that the case presents."  *Kopp*, 280 F.3d at 885.

"In some cases," the removing defendant will need "to provide additional evidence demonstrating that removal is proper" to satisfy the burden.  *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061 (11th Cir. 2010).  "In other cases, however, it may be 'facially apparent' from the pleading itself that the amount in controversy exceeds the jurisdictional minimum," and "the court itself may be better-situated to accurately assess" whether this is so.  *Id.*  A court may "employ[] its judicial experience or common sense" to ascertain whether the relevant jurisdictional fact is present.  *See id.* at 1063; *see also Waters v. Ferrara Candy Co.*, 873 F.3d 633, 636 (8th Cir. 2017) (per curiam) (noting that the amount in controversy may be established by "specific factual allegations . . . combined with reasonable deductions, reasonable inferences, or other reasonable extrapolations").

In the notice of removal, Defendants represented that "a reasonable fact finder might conclude the damages are greater than the requisite amount."  We find ourselves situated adequately to assess whether this is true at this stage, *see Roe*, 613 F.3d at 1061, and we agree that "a fact finder might legally conclude" that "the damages are greater than the requisite amount," *see Kopp*, 280 F.3d at 885.

In their complaint, Plaintiffs alleged that Defendants' statements "have damaged and continue to damage Plaintiffs' well-earned reputations for honesty and

fair dealing in their professions," that Turntine "has experienced mental anguish and suffering" because of them, and that Promotional Services "has lost revenue and business opportunities" on account of them. Plaintiffs also provided specific factual allegations making these assertions plausible. In similar cases, plaintiffs seeking "in excess of $25,000" in actual damages based on single counts of defamation have been awarded in excess of $75,000 in actual damages. *See, e.g.*, *Scott v. LeClercq*, 136 S.W.3d 183, 186 (Mo. Ct. App. 2004). As such, we conclude the relevant jurisdictional fact is present here. *See Kopp*, 280 F.3d at 885; *Angus*, 989 F.2d at 146 (concluding similarly even though plaintiff only pleaded damages "in excess of" eighty percent of the jurisdictional threshold because "a reasonable jury likely could have valued [plaintiff's] losses" as exceeding the threshold); *see also Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366-68 (7th Cir. 1993), *abrogated on other grounds by Meridian Sec. Ins. v. Sadowksi*, 441 F.3d 536 (7th Cir. 2006) (finding the jurisdictional threshold met even though the complaint "asked only for damages 'in excess of'" thirty percent of the threshold).

Plaintiffs have not shown to a legal certainty that they could not recover in excess of $75,000 in actual damages. *Kopp*, 280 F.3d at 885. At most, after we questioned the amount in controversy, they suggested it is unclear if "a factfinder could legally conclude" their actual damages exceed $75,000. Decisions like *LeClerq*, 136 S.W.3d 183, however, persuade us otherwise.

Assured of our jurisdiction, we now proceed to the merits.

**III.**

We review a dismissal for failure to state a claim *de novo*, accepting all well-pleaded factual allegations as true and construing all reasonable inferences in the nonmoving party's favor. *Vigeant*, 953 F.3d at 1024. In a diversity action such as this, we also review *de novo* the district court's interpretation of state law. *Keller Farms*, 944 F.3d at 979-80.

-8-

A.

Under Missouri law, the elements of defamation are (1) publication (2) of a defamatory statement (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) that damages the plaintiff's reputation. *Overcast v. Billings Mut. Ins.*, 11 S.W.3d 62, 70 (Mo. 2000). The district court dismissed all three of Plaintiffs' counts for failure to state a claim on the basis that the second element was not satisfied due to the fact that the statements in question were not actionable because either the statements were not defamatory or they were privileged as opinion. *Turntine*, 2019 WL 2076047, at *4-6. In Missouri, determining whether statements are actionable as defamation is a two-step process. *Hammer v. City of Osage Beach*, 318 F.3d 832, 842 (8th Cir. 2003).

First, the reviewing court "must determine whether a statement is capable of defamatory meaning." *Henry v. Halliburton*, 690 S.W.2d 775, 779 (Mo. 1985). A "defamatory meaning" is a meaning that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* In determining whether words are capable of such meaning, the reviewing court must consider them "'in context, giving them their plain and ordinarily understood meaning.'" *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 798 (Mo. 2017) (quoting *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 311 (Mo. 1993)).

Second, if the statements in question are capable of such a meaning, the reviewing court must determine whether a privilege shields the defendant from legal action. *Henry*, 690 S.W.2d at 779; *Pape v. Reither*, 918 S.W.2d 376, 380 (Mo. Ct. App. 1996). The only privilege that Defendants argue applies here is the opinion privilege: "there can be no liability under state defamation law for statements of opinion." *Smith*, 519 S.W.3d at 799. This privilege does not apply, however, if a statement "implies an assertion of objective facts," even if couched as an opinion. *Id.* at 799-800. To determine if an ostensible opinion statement implies an assertion of objective facts, the reviewing court must consider the "totality of the

circumstances." *Henry*, 690 S.W.2d at 788. And at this stage, the test for whether this privilege applies is "whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Smith*, 519 S.W.3d at 800.

B.

Before applying this two-step standard to the specifics of Plaintiffs' claims, we must address a dispute about the correct legal standard under Missouri law. The district court identified an additional component of the analysis that Defendants argue applies here; namely, that if "a statement is capable of a nondefamatory meaning, and can be reasonably construed in an innocent sense, [the Court] must hold the statement nonactionable as a matter of law." *Turntine*, 2019 WL 2076047, at *3. This principle is referred to as the innocent-construction rule. *See* 53 C.J.S. *Libel and Slander; Injurious Falsehood* § 33 (2020).

A line of Missouri Court of Appeals decisions furnishes support for the view that Missouri follows the innocent-construction rule. *See, e.g.*, *Castle Rock Remodeling, LLC v. Better Bus. Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 239 (Mo. Ct. App. 2011); *State ex rel. Diehl v. Kintz*, 162 S.W.3d 152, 155 (Mo. Ct. App. 2005); *Mandel v. O'Connor*, 99 S.W.3d 33, 36 (Mo. Ct. App. 2003); *Chastain v. Kan. City Star*, 50 S.W.3d 286, 288 (Mo. Ct. App. 2001); *Ampleman v. Scheweppe*, 972 S.W.2d 329, 333 n.2 (Mo. Ct. App. 1998) (per curiam). As the *Ampleman* court explained, this rule renders statements nonactionable even if they are capable of a defamatory meaning so long as they are also capable of a nondefamatory meaning. 972 S.W.2d at 333 n.2.

We recognize that in the absence of Missouri Supreme Court precedent deciding an issue, decisions of the Missouri Court of Appeals are "persuasive authority" that we "must follow" when "they are the best evidence of what state law is." *United Fire & Cas. Ins. v. Garvey*, 328 F.3d 411, 413 (8th Cir. 2003) (brackets omitted). We need not follow them, however, if we are "convinced by other persuasive data that the [Missouri Supreme Court] would decide otherwise."

-10-

*Council Tower Ass'n v. Axis Specialty Ins.*, 630 F.3d 725, 728 (8th Cir. 2011). "Persuasive data" includes "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data." *Symphony Diagnostic Servs. No. 1 Inc. v. Greenbaum*, 828 F.3d 643, 646 (8th Cir. 2016). In light of the following, we conclude the Missouri Supreme Court would not recognize the innocent-construction rule as the law of Missouri if this question were before it.

Before 1993, Missouri "courts made distinctions between *per se* and *per quod* defamation actions." *Taylor v. Chapman*, 927 S.W.2d 542, 544 (Mo. Ct. App. 1996). A *per se* claim arose out of words "defamatory on their face," whereas a *per quod* claim arose out of words "not defamatory on their face." *Capobianco v. Pulitzer Publ'g Co.*, 812 S.W.2d 852, 855 (Mo. Ct. App. 1991). A statement that was not actionable *per se* nevertheless could be actionable *per quod*. *Langworthy v. Pulitzer Publ'g Co.*, 368 S.W.2d 385, 388 (Mo. 1963).

The innocent-construction rule only applies in the *per se* context. *Tuite v. Corbitt*, 866 N.E.2d 114, 125 (Ill. 2006); *accord Gupta v. The Lima News*, 744 N.E.2d 1207, 1213 (Ohio Ct. App. 2000). And only a few states apply it in that context. *See* Rodney A. Smolla, 1 *Law of Defamation* §§ 4:21-22 (2d ed. 2019) (identifying Ohio and Illinois as the only states following this rule).

Although confusion on this point crept into its caselaw later, the Missouri Supreme Court explicitly and repeatedly rejected the innocent-construction rule long ago. *See, e.g.*, *Diener v. Star-Chronicle Publ'g Co.*, 132 S.W. 1143, 1148 (Mo. 1910) ("Courts no longer construe words in their most favorable and mild sense . . . ."); *Ukman v. Daily Record Co.*, 88 S.W. 60, 65 (Mo. 1905) ("The correct rule in construing words seems to be that they are to be taken, not in mitiori sensu, but in their fair English meaning . . . ."); *Fallenstein v. Booth*, 13 Mo. 427, 430 (1850) ("The old doctrine that words spoken slanderously are to be taken in *mitiori sensu*, has long since been abandoned.").

Consistent with this position, the Missouri Supreme Court has also recognized that a fact question exists whenever "a statement is capable of defamatory meaning," even if it is also capable of nondefamatory meaning. *See Henry*, 690 S.W.2d at 779; *see also Coots v. Payton*, 280 S.W.2d 47, 55 (Mo. 1955) ("While these words are capable of a nondefamatory construction, . . . . [w]e . . . may not say as a matter of law that the words were not defamatory . . . ."); *McGinnis v. George Knapp & Co.*, 18 S.W. 1134, 1138 (Mo. 1892) ("'If the words published are fairly capable of two meanings[]—one harmless and the other defamatory[]—it is a question for the jury . . . .'" (quoting *Twombly v. Monroe*, 136 Mass. 464, 468 (1884))).

Without overruling, distinguishing, or even addressing these precedents, the Missouri Supreme Court in *Walker v. Kansas City Star Co.* announced that "in considering whether a publication is libelous per se, words to be considered actionable . . . should be construed in their most innocent sense." 406 S.W.2d 44, 51 (Mo. 1966). As support for this proposition, the *Walker* court cited only *Atterbury v. Brink's Express Co.*, a Missouri Court of Appeals decision that itself quoted only one of that court's own precedents to the effect that words "'should be understood and construed in their most innocent sense'" before they may be deemed actionable *per se*. 90 S.W.2d 807, 809 (Mo. Ct. App. 1936) (quoting *Kunz v. Hartwig*, 131 S.W. 721, 724 (Mo. Ct. App. 1910)). But *Kunz* was not good law on this point when the *Atterbury* court quoted it. In fact, "the same learned Judge," *Lowe v. De Hoog*, 193 S.W. 969, 970-71 (Mo. Ct. App. 1917), who wrote *Kunz* authored *Vanloon v. Vanloon* the next year, in which he recognized that the Missouri Supreme Court in *Ukman*, 88 S.W. 60, and elsewhere had rejected the "absurdity" that was the innocent-construction rule and recast *Kunz* to conform to Missouri law on this point. 140 S.W. 631, 633-34 (Mo. Ct. App. 1911); *see Lowe*, 193 S.W. at 970-71 (recognizing that *Kunz* did "not correctly state the law"). In other words, it seems the *Walker* court imported the innocent-construction rule into Missouri law based on repudiated Missouri Court of Appeals precedent that conflicted with the Missouri Supreme Court's own longstanding position on the matter.

*Walker* thus unsurprisingly introduced confusion into Missouri law about whether the innocent-construction rule applied to *per se* claims. *See Capobianco*, 812 S.W.2d at 855 (recognizing the "two different standards" applied by the Missouri Supreme Court in this context and trying to harmonize them).

In *Nazeri*, the Missouri Supreme Court recognized that the rule of *Walker* was not "absolutely consistent" with the standard articulated in its "other precedents" for determining "whether a statement of fact is defamatory *per se*." 860 S.W.2d at 311. In that case, the *Nazeri* court concluded that these standards "should be read together" and found that the statement was actionable no matter which standard applied. *See id.* The court then recognized "the undue difficulty of use of the traditional *per se* and *per quod* requirements," commented on how "attempts to characterize" statements "as *per se* or *per quod* appear more artificial than real," noted that this traditional framework "may have a very real impact more far-reaching than justified," stated it "creates unjustifiable inequities," and held that "in defamation cases the old rules of *per se* and *per quod* do not apply." *Id.* at 312-13. As such, it declared that "plaintiffs need not concern themselves with whether the defamation was *per se* or *per quod*" any longer. *Id.* at 313.

Given it was only ever applicable in the *per se* context, *see Walker*, 406 S.W.2d at 51, the innocent-construction rule should not have survived *Nazeri*'s abrogation of the *per se*/*per quod* framework and creation of a "unified" framework in which the same standards apply to either type of claim, *see Nazeri*, 860 S.W.2d at 312-13—a point the Missouri Supreme Court has since implicitly recognized, *see Smith*, 519 S.W.3d at 798 ("To determine whether a statement is defamatory, 'the alleged defamatory words must be considered in context, giving them their plain and ordinarily understood meaning.'" (quoting *Nazeri*, 860 S.W.2d at 311)). After all, if the innocent-construction rule still applied, then only those claims based on statements that are facially and unequivocally defamatory would be actionable after *Nazeri*. But to read *Nazeri* in this way, as *Ampleman* did in finding it ratified the innocent-construction rule, *see* 972 S.W.2d at 333 n.2, makes *Nazeri* internally contradictory given its assurance that "plaintiffs need not concern themselves" any

-13-

longer with whether statements were facially defamatory (that is, defamatory *per se*) to state a claim for defamation, 860 S.W.2d at 313.

It appears, then, that *Ampleman* and subsequent Missouri Court of Appeals decisions following it misapplied *Nazeri* and, as a result, turned the logic of that decision on its head. As such, we do not ask whether the statements at issue here are capable of nondefamatory meaning when "construed in an innocent sense." *See Ampleman*, 972 S.W.2d at 333 n.2. Instead, consistent with the analytical framework laid out above, *see* Section III.A., we ask only whether the statements are capable of defamatory meaning based on their plain meaning and, if so, whether the opinion privilege applies at this stage.

## C.

With the table now set, we turn at last to the substance of Plaintiffs' defamation claims. These claims are based on three statements from Defendants:

- In the first, Defendants responded to a statement by Plaintiffs about the parties' business dealings by asserting that Plaintiffs "manipulate[]" and "lie[]."
- In the second, Peterson expounded on Defendants' previous statement by discussing how Turntine's explanation for the parties' soured business relationship was not true and that the true explanation was that Turntine had engaged in underhanded business dealings with Peterson.
- In the third, Peterson doubled down on Defendants' claim that Plaintiffs were liars, responding to multiple individuals inquiring about whether Peterson's claims were just bluster by asserting that he meant what he said.

The district court concluded that the first statement was "not defamatory as a matter of law" because it was "a response to Plaintiffs' prior post and not . . . a

statement of objective fact regarding Plaintiffs' moral character." It concluded that the second statement was not actionable because it consisted of "mere opinion." And it concluded that the third statement was not actionable both because it was "not capable of a defamatory meaning as a matter of law" and because it consisted of subjective opinion that "cannot be provable as false." We disagree on all counts.

First, each of these statements appears capable of defamatory meaning; that is, capable of a meaning that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Henry*, 690 S.W.2d at 779. Words that impute "fraud, want of integrity, or misconduct in the line of one's calling" are capable of such a meaning. *Nazeri*, 860 S.W.2d at 311; *see also Matter of Westfall*, 808 S.W.2d 829, 833 (Mo. 1991) (recognizing that calling someone a liar can cause "'damage to reputation'" and thus be capable of defamatory meaning (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). In *Anton v. St. Louis Suburban Newspapers, Inc.*, for instance, the Missouri Court of Appeals concluded that statements characterizing a lawyer's work as "sleazy dealings" and a "sleazy sleight-of-hand" were capable of defamatory meaning because they "affect[ed] him in his professional character" and imputed to him "dishonesty" and "misconduct incompatible with the proper conduct of his profession." 598 S.W.2d 493, 497 (Mo. Ct. App. 1980).

Similarly here, each of Defendants' statements is capable of defamatory meaning. The first statement accused Plaintiffs of dishonesty about the reason for the parties' soured business relationship. The second statement built on the first by providing specifics—specifics that charged Plaintiffs with want of integrity in their business dealings. The third statement resembled the first insofar as Peterson once again accused Turntine of being a liar and manipulator. That these statements might harm Plaintiffs' reputation and "deter third persons from associating or dealing with" Plaintiffs, *Henry*, 690 S.W.2d at 779, is borne out by the fact that one of the individuals who commented on Defendants' video asked Peterson to clarify if he really meant what he said because that individual did not "want to be involved in a league that lies to it's [sic] players."

-15-

Second, the opinion privilege does not render these statements nonactionable at this stage. In light of the totality of the circumstances and context in which these statements were made, a reasonable factfinder could conclude that these statements at a minimum imply an assertion of objective fact. *See Smith*, 519 S.W.3d at 798-800; *Henry*, 690 S.W.2d at 779, 788.

In the first statement, Defendants were responding to an earlier statement by Plaintiffs regarding the parties' business dealings and thus implying that Plaintiffs had misrepresented facts about those dealings. This implies an assertion of objective fact—Plaintiffs were not telling the truth about past events. *See Matter of Westfall*, 808 S.W.2d at 833 (noting how the statement "[i]n my opinion John Jones is a liar" implies "a knowledge of facts which lead to the conclusion that Jones told an untruth" (quoting *Milkovich*, 497 U.S. at 19)).

In the second statement, Defendants went even further by detailing how and why Plaintiffs had lied: to cover up the fact that Plaintiffs had cheated Defendants out of a benefit of their agreement. While certain assertions in this statement could constitute privileged opinion—such as Peterson's claim that Turntine had acted with "selfishness and greed," *see Anton*, 598 S.W.2d at 498-99 (noting that a defendant is not liable for a "derogatory opinion" accompanied by a "statement of false and defamatory facts")—the statement in general and in context charges Plaintiffs with engaging in underhanded business dealings and lying to cover up those dealings. Furthermore, Plaintiffs' defamation claim arising from this statement is not based on Defendants' passing accusation that Plaintiffs were selfish and greedy but rather on the factual assertions about the parties' past dealings that Plaintiffs allege were "false in multiple respects." The opinion privilege thus does not defeat this claim. *See id.* (recognizing that the defendant is still "liable for the false statements" made in conjunction with the "expression of a derogatory opinion" so long as the plaintiff relies on the false statements and not just the opinion to support the defamation claim); *see also Buller v. Pulitzer Publ'g Co.*, 684 S.W.2d 473, 476, 479 (Mo. Ct. App. 1984) (reversing dismissal of defamation claim based on artistic depiction of

plaintiff that visually asserted "false and defamatory facts" about her accompanied by "derogatory opinion").

In the third statement, Peterson repeated his claim that Turntine was a liar and manipulator, and the circumstances in which this statement was made rebut any notion that Peterson was just conveying his subjective opinion about Turntine. In context, Facebook users who had seen Peterson's video wanted to know if he meant what he said literally or if he was just speaking rhetorically because, for instance, he did not like Turntine. Given this opportunity to clarify his words were just nonfactual bluster, Peterson instead doubled down, explaining that he meant to claim Turntine actually lied. Again, these alleged lies were about objectively verifiable historical facts: what happened between the parties that led to the souring of their business relationship. As such, Peterson's statements appear provable as false, notwithstanding the district court's conclusion to the contrary. *See Smith*, 519 S.W.3d at 798-99.

In sum, Defendants' three statements are all capable of defamatory meaning and could be viewed as implying assertions of objective fact. Thus, Plaintiffs' three claims predicated on these statements should not have been dismissed.

## IV.

For the foregoing reasons, the district court erred in concluding that Plaintiffs' complaint failed to state a claim for defamation and in dismissing each of the three counts therein. We therefore reverse and remand for further proceedings consistent with this opinion.

_____