Carolyn KENNEY, Respondent,

v.

WAL–MART STORES, INC., Appellant.

No. SC 84770.

Supreme Court of Missouri, En Banc.

April 1, 2003.

Michael S. Cessna, Bentonville, for Appellant.

Michael W. Blanton, Lee's Summit, Thomas C. Locke, Independence, for Respondent.

Joseph E. Martineau, Benjamin A. Lipman, St. Louis, for amicus curiae.

WILLIAM RAY PRICE, JR., Judge.

## I.

Wal–Mart Stores appeals a verdict entered against it awarding Carolyn Kenney $33,750 in actual damages and $392,083 in punitive damages. The Court finds that the trial court erred in submitting a materially altered verdict director. The judgment is reversed and the case is remanded.

## II.

### A. Background

Carolyn Kenney is the grandmother of Lauren Kenney, a minor child, and the mother of Lauren's father, Christopher. Chris Kenney and Lauren's mother, Angela Miles (now Angela Mueller), were never married and had not sought a formal declaration of visitation rights. Chris had regular visitation with Lauren "at least every other weekend" and sometimes during the week. When keeping Lauren, Chris would stay at his mother's home and Ms. Kenney would frequently pick up Lauren from Angela's home.

In August 1996, Chris learned that Angela might leave Missouri and move to Georgia with her sister. Chris and Ms. Kenney took Lauren to a friend's house at the Lake of the Ozarks over Labor Day weekend in an effort to keep Lauren in Missouri until a custody hearing the following Tuesday. Christopher Kenney called Angela from the lake on Saturday and told her of the custody hearing and that he was keeping Lauren for the weekend. He did not tell Angela where he and Lauren were.

Angela reported Lauren as a missing child to the Kansas City Missouri Police Department. On Sunday, she and her family placed up to 100 missing child posters around the Kansas City area. These posters contained a picture of Ms. Kenney and Lauren and stated:

Last seen 1:30 p.m. on 8/30/96 leaving her home with paternal grandmother, Carolyn Kenney, in a 1996 or 1997 white Honda Accord, no visible license plate, now with father Christopher Kenney, and grandmother at unknown location.

Angela and her family also contacted KSHB–TV 41, which broadcast a report identifying Lauren as a missing child and in the custody of Christopher and Carolyn Kenney.

At trial, Ms. Kenney admitted that the textual statements and photographs contained on the poster were true as of Saturday and Sunday of Labor Day weekend, 1996. She did dispute that Lauren was "missing" because Angela knew that Lauren was with Chris Kenney, even though Chris refused to tell Angela his location. In any event, Ms. Kenney claims that the poster became false, and thus defamatory, after she returned home and was no longer with Chris and Lauren Kenney or on Tuesday, September 3, 1996, when Lauren was returned to Angela Miles.

### B. Failure to Remove the Poster

One of the missing person posters made its way into the Missing Children's Network display case in the Lee's Summit Wal–Mart. The Missing Children's Network is a partnership program between Wal–Mart and the National Center for Missing and Exploited Children (NCMEC). As part of the agreement, the NCMEC packages approved posters and ships them to Wal–Mart stores each month.

To protect against inaccurate information, Wal–Mart's policy is to display only those posters provided by the NCMEC and to keep the display case locked. Should an unauthorized poster be placed in the display, it is Wal–Mart's policy that the

poster be taken down immediately. Wal–Mart headquarters mandated that its associates are expected to maintain the display cases and keep the displays updated.

The unauthorized poster created by Angela Miles and her family was not immediately removed from the Wal–Mart display. There was evidence that as many as three different persons contacted Wal–Mart managers on at least four occasions regarding the poster, beginning on the Sunday of Labor Day weekend. Even if the poster was initially true, there was also evidence that the poster was not removed for days after Lauren was returned to Angela and ceased to be missing.

## C. Damages

Carolyn Kenney had prior emotional problems as the result of being terminated from her job at Hallmark earlier in 1996. She sought treatment from a psychiatrist for these emotional problems prior to and after this incident involving the missing child poster. Ms. Kenney testified that the emotional problems resulting from the loss of her job were not the same as the problems resulting from the poster, because there was no publication that she lost her job at Hallmark.

Ms. Kenney did not see the KSHB broadcast when it occurred on September 2, 1996. However, people called her home that evening to inquire about the report and she later saw a videotape of the segment. She testified that she felt "embarrassed, shocked, hurt, [and] concerned" as a result of the broadcast. She also felt that the broadcast hurt her "very deeply" and injured her reputation.

While Ms. Kenney testified that she was not seeking damages from Wal–Mart for

either the KSHB broadcast[1] or the Hallmark termination, she was unable to distinguish the harm from the KSHB broadcast and the poster. Ms. Kenney felt that the injury to her reputation from the poster was "equally painful and devastating" to that from the television broadcast. She believed "they [were] the same kind of injury." Her husband, Thomas Kenney, also testified that both the KSHB 41 broadcast and the poster "hurt" and "bothered" her. Further, Ms. Kenney did not attempt to differentiate harm that might have resulted from the additional 99 posters that Angela Miles and her family posted at other locations.

The missing child poster was displayed in Wal–Mart for up to ten days where somewhere between 4000 and 6000 people walked past it each day. As a result of the poster, Ms. Kenney testified that she felt "embarrassed, shocked, mad." Like the television report, Ms. Kenney did not actually see the poster while it was on display. She testified that several people told her that they saw the poster, though she did not remember precisely how many people, nor could she identify anyone. Ms. Kenney did not get medical treatment for the embarrassment, hurt, and shock caused by the poster. She testified that she had already sought treatment before and she did not want to let the incident cause her problems and hurt her family.

Although Ms. Kenney claimed damage to her reputation, she was not aware of any family members who actually saw the poster at Wal–Mart and could not identify anyone who treated her in a lesser fashion as a result of seeing the poster. But, she did not believe that someone would "walk up and just tell [her] that they're going to treat [her] any less." She could not name

---

1. Ms. Kenney previously filed suit against KSHB and was dismissed on summary judgment based on the fair report privilege. *Ken-* *ney v. Scripps Howard Broad. Co.*, 259 F.3d 922 (8th Cir.2001).

anyone who respected her less or thought her reputation was not as good because of the poster. The only person Ms. Kenney could name, Patty Wyke, testified that the poster did not affect her relationship with Ms. Kenney. Finally, there was evidence that Ms. Kenney visited a psychologist again in 1998. She complained of the damage to her reputation resulting from the Hallmark incident, but did not mention the poster displayed at Wal–Mart.

The jury returned a verdict finding that Wal–Mart published the poster by failing to remove it from its premises. The jury awarded Ms. Kenney $33,750 in compensatory damages and $392,083 in punitive damages.

### III.

Wal–Mart asserts nine points on appeal. It is necessary for this Court to address only two: The submitted verdict director and the sufficiency of proof of actual damage.

■■■ A trial court's instructional error is reversible where "the error substantially prejudiced a party." *Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310, 329 (Mo.App. 2000). Any deviation from an approved MAI instruction is presumed prejudicial error unless the contrary is shown. *State v. Westfall*, 75 S.W.3d 278, 284 n. 27 (Mo. banc 2002).

The model instruction for MAI 23.06(1) requires that plaintiff prove: "Fifth, the plaintiff's *reputation* was thereby damaged." (emphasis added). However, the instruction, as submitted to the jury, read: "Fifth, the poster directly caused or directly contributed to cause *damage* to Plaintiff." Arguing this instruction to the jury, Ms. Kenney's trial counsel said: "You saw my client on the witness stand in describing how it felt to know that four to six thousand people a day were looking at that poster, and you could see how she was on

that witness stand. Does anyone doubt that that at least contributed to cause damage to her?"

Missouri, as well as several other states—including Arkansas, Kansas, and New York—have adopted rules requiring a plaintiff to prove reputational harm before allowing recovery for other related injuries, such as emotional distress, in defamation cases. *See* MAI 23.06(1) (requiring the jury to find damage to plaintiff's reputation as an element of the verdict director); *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000) (citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo. banc 1993)) (listing "6) damage[to] the plaintiff's reputation" as the final element for a claim of defamation); *Little Rock Newspapers v. Dodrill*, 281 Ark. 25, 660 S.W.2d 933 (Ark.1983); *Gobin v. Globe Publ'g Co.*, 232 Kan. 1, 649 P.2d 1239 (Kan.1982); *France v. St. Clare's Hosp. & Health Ctr.*, 82 A.D.2d 1, 441 N.Y.S.2d 79 (1981); *Salomone v. MacMillan Publ'g Co.*, 77 A.D.2d 501, 429 N.Y.S.2d 441 (N.Y.App.Div.1980).

Tort law has historically required injury to reputation as a prerequisite to other emotional damage in defamation actions. "Defamation is not concerned with the plaintiff's own humiliation, wrath or sorrow, except as an element of 'parasitic' damages attached to an independent cause of action." WILLIAM L. PROSSER, THE LAW OF TORTS, § 111, at 737 (4th ed.1971). "Harm to reputation or good name is the essence of libel and slander, so the plaintiff can have no recovery in libel or slander for emotional distress or economic loss unless her reputation is implicated." DAN B. DOBBS, THE LAW OF TORTS, § 400, at 1117 (2001).

Should a plaintiff be unable to show actual harm to reputation resulting from the defamation, she would not be without a

remedy. There are several other independent remedies available to recover mental anguish damages if no damage to reputation can be shown. For example, negligent and intentional infliction of emotional distress. *See Bass v. Nooney*, 646 S.W.2d 765 (Mo. banc 1983); *Pretsky v. Southwestern Bell Tel. Co.*, 396 S.W.2d 566 (Mo. 1965), *abrogated on other grounds by Bass v. Nooney*.

■■■ The submitted instruction materially modified the model instruction. The modification submitted to the jury removed the prerequisite of actual reputational damage. Ms. Kenney's argument to the jury focused solely on mental anguish and did not address reputational harm. The trial court's instruction misdirected the jury and allowed recovery of "parasitic" damages without finding injury to reputation. This error requires reversal.[2]

## IV.

Wal–Mart also challenges the sufficiency of Ms. Kenney's proof of actual damages resulting from the alleged defamation.

■■■ A case should not be submitted to the jury "unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995) (internal quotations and citation omitted). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Zeigenbein v. Thornsberry*, 401 S.W.2d 389, 393 (Mo.1966) (internal quotations and citation omitted). This Court reviews *de novo* "whether the evidence in a given case is substantial." *Probst v. Seyer*, 353 S.W.2d ·798, 802 (Mo. 1962) (citations omitted).

### A.

This Court addressed the issue of damages resulting from a defamation in *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo. banc 1993). Prior to *Nazeri*, defamation *per se* resulted from "allegations that the plaintiff was guilty of a crime, was stricken with a loathsome disease or was unchaste (in the case of a woman), or which affected the plaintiff in his business or occupation." *Carter v. Willert Home Prod., Inc.*, 714 S.W.2d 506, 509 (Mo. banc 1986). In these instances, damages were "conclusively presumed" and plaintiff was not required to show proof of actual harm. *Id.*

Actions for other forms of defamation were said to arise *per quod*. *Per quod* damages were not presumed and the plaintiff prevailed only if she could show sufficient special damage. *Id.* Only those damages capable of assessment in monetary value were sufficient to recover for defamation *per quod*. *Id.*

The loss of a marriage, of employment, of income, of profits, and even of gratu-

---

2. Wal–Mart also raised whether "truth" is an affirmative defense to be proved by defendant, or "falsity" is an element of the cause of action to be proved by plaintiff. Language in our recent cases of *Nazeri v. Missouri Valley College*, 860 S.W.2d 303 (Mo. banc 1993) and *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62 (Mo. banc 2000) suggest different answers to this issue, although neither case addressed the issue expressly. The resolution of this issue has constitutional dimensions. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). "A court will avoid the decision of a constitutional question if the case can be fully determined without reaching it." *State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n*, 687 S.W.2d 162, 165 (Mo. banc 1985). *See also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This Court does not address the issue here and leaves it unresolved.

itous entertainment and hospitality will be special damage if the plaintiff can show that it was caused by the defendant's words; but not mere annoyance or loss of peace of mind, nor even physical illness occasioned by the defamatory charge.

*Id.* Once the court determined that a defamation was actionable (either *per se* or upon proof of special damage) "the plaintiff is entitled to recover such actual damages as may have resulted from the slander, including damages for emotional distress." *Id.* at 510. Such distinctions resulted in recovery of damages that were not proven in one instance (*per se*) and no recovery in the other (*per quod*) unless the harm could be reduced to a monetary loss. Neither result was entirely satisfactory.

*Nazeri* discussed the difficulty of characterizing actions as *per se* or *per quod* and determined that such distinctions "appear more artificial than real." *Nazeri,* 860 S.W.2d at 312. This Court noted that "the result of the classifications may have a very real impact more far-reaching than justified." *Id.* at 312–13. Consequently, the old rules of *per se* and *per quod* were abandoned and plaintiffs no longer needed to "concern themselves with whether the defamation was *per se* ..., nor with whether special damages exist, *but must prove actual damages in all cases.*" *Id.* at 313 (emphasis added).

### 1. Missouri

There have been several Missouri cases addressing the issue of actual damages resulting from defamation. In *Bauer v. Ribaudo,* 975 S.W.2d 180 (Mo.App.1997), plaintiff was a candidate for state representative. *Id.* at 181. Ribaudo, the incumbent, produced a television commercial that aired on St. Louis television stations. *Id.* The commercial stated: "And it was

Tom Bauer that was part of the city court clerk gang, the same gang the Post–Dispatch reported may have stolen over one million dollars." *Id.* The court noted Bauer's failure to show actual damages in affirming the grant of summary judgment. *Id.* at 181–83.

Bauer relied primarily on his statement that "people refused his ballot and said crude remarks about the theft." *Id.* at 182. However, Bauer failed to name one person who changed his or her vote as a result of the commercial. *Id.* Bauer specifically admitted that he did not have the name of one individual who voted for Ribaudo and not him after seeing the commercial. *Id.* He failed to present any evidence of his standing in the polls prior to and after the airing of the commercial. *Id.* Further, the court noted that "[c]rude remarks about thefts lack the specificity to raise a genuine issue of fact." *Id.* Finally, the court noted that "[a]ctual damages may not be based on evidence that is too speculative." *Id.* at 183 (citation omitted).

Bauer appeared to suggest that he did not need to present any evidence of actual damages, "as damages [could] be presumed from the complained of statement." *Id.* However, this was not the case. *Id.* To allow such a result would revert back to the old rules regarding *per se* and *per quod* defamation actions. *Id.*

Another similar case is *Taylor v. Chapman,* 927 S.W.2d 542 (Mo.App.1996). Ingrid Taylor brought a defamation action against Chapman alleging libel based on statements made in a letter Chapman wrote and distributed to all homeowners in a condominium association and slander based on Chapman's statements about the letter to a postman. *Id.* at 544. Another resident, Librach, confronted Taylor in the lobby and accused her of "getting into" the mailboxes. *Id.* A third resident overheard this accusation. *Id.*

In her testimony, Taylor "stated that her integrity had been tarnished." *Id.* However, she "did not support this conclusion and admitted no one told her they had lost trust or confidence in her ability." *Id.* "[S]he did not seek medical treatment, psychiatric or psychological counseling, nor was she treated with any medication." *Id.* Taylor "was not disciplined by her employer in any way and had no change in her duties." *Id.* She "indicated no claim of stress or sleeplessness over the incidents, and apparently suffered no symptoms associated with mental distress." *Id.* Finally, Taylor "could not differentiate between the damages, if any, attributable to defendant and the damages attributable to Librach." *Id.* She testified that "[t]hey run together." The court determined that because Taylor's damages "run along together" she could not recover. *Id.*

### 2. Eighth Circuit

This issue was also addressed in *Arthaud v. Mutual of Omaha Ins. Co.*, 170 F.3d 860, (8th Cir.1999) (applying Missouri law). Arthaud brought suit for defamation resulting from his termination from Mutual of Omaha. In its analysis, the Eighth Circuit noted:

> Since *Nazeri*, ... Missouri courts require a showing of actual damages in all defamation cases. [*Nazeri*, 860 S.W.2d at 313.] To demonstrate actual damages, plaintiffs must show that defamatory statements caused a quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression.

*Arthaud*, 170 F.3d at 862 (citations omitted).

### 3. Other States

New Jersey dealt with defamation damages in *Rocci v. MacDonald–Cartier*, 323 N.J.Super. 18, 731 A.2d 1205 (1999). *Rocci* involved an allegedly defamatory letter sent to the principal of the school where the plaintiff was a teacher and discussed New Jersey's handling of defamation damages. *Id.* at 1207–08. Quoting *Sisler v. Gannett Co., Inc.*, 104 N.J. 256, 516 A.2d 1083, 1086 (1986), the court said:

> Injury to reputation, even more so than personal injury or mental anguish, which are both amenable to expert testimony, defies exact measurement
>
> .... Accordingly, a plaintiff should offer some concrete proof that his reputation has been injured. One form of proof is that an existing relationship has been seriously disrupted, reflecting the idea that a reputation may be valued in terms of relationships with others. Testimony of third parties as to a diminished reputation will also suffice to prove "actual injury." *Awards based on a plaintiff's testimony alone or on "inferred" damages are unacceptable.*

*Rocci*, 731 A.2d at 1208–09. The court determined that plaintiff failed to prove actual injury, because she admitted that she sustained no mental or physical injury and because no "single person came forward to state that plaintiff's reputation had been besmirched" by the allegedly defamatory letter. *Id.* at 1209.

Tennessee offered a relatively strict view of defamation damages in *Murray v. Lineberry*, 69 S.W.3d 560 (Tenn.Ct.App. 2001). The court stated that "mere annoyance or loss of peace of mind, are not enough to qualify for actual damages." *Id.* at 564 (internal quotations and citations omitted). The court cited to *Moore v. Bailey*, 628 S.W.2d 431 (Tenn.Ct.App.1981) as an example of proving actual damages. *Murray*, 69 S.W.3d at 564. In *Moore*, the plaintiff testified that "he was unable to get away from the [defamatory] statements" and "was even approached by one

of the defendant's employees at Army Guard camp, which caused him to quit the Army Guard." *Id.* The *Moore* plaintiff further testified that the statement "was in his mind and disturbed his mind as well as his family" and "affected the performance of his duties because it was always on his mind." *Id.*

The *Murray* plaintiff testified that "various individuals had approached him concerning the [allegedly defamatory] commercials" and that this "embarrassed him." *Id.* He also testified that "individuals from church told the parents of his fiancée ... that they should keep [him] away from her." *Id.* Finally, the plaintiff "believed he had not been invited to a few private parties due to the advertisements," but did not present proof of this allegation.

The court concluded that none of the harm complained of "rose above embarrassment stemming from individual encounters." *Id.* The court reasoned that although various people asked plaintiff about the allegations, "the questions were not a constant presence in his life." *Id.* at 565. Further, "there was no evidence that the embarrassment hampered [plaintiff's] ability to perform his job." *Id.* Thus, the evidence did "not rise above 'anger, mere annoyance or loss of peace of mind.'" *Id.*

Hawaii held there was no proof of actual damages where the plaintiff lost no income, incurred no expenses to mitigate, correct or counter the statement, no person indicated that they thought less of plaintiff because of the statement, and there was no change in the behavior of those plaintiff regularly encountered. *Jenkins v. Liberty Newspapers Ltd. P'ship,* 89 Hawai'i 254, 971 P.2d 1089, 1103 (1999) (quoting *Richie v. Paramount Pictures Corp.,* 544 N.W.2d 21, 26–27 (Minn. 1996)). *Jenkins* reported "only 'three or four' inquiries from acquaintances" regard-

ing the statement and could not "name anyone whom he believes thinks less of him because of the erroneous publication." *Id.* Thus, the court concluded that his testimony was too vague and speculative to prove actual damage to his reputation. *Id.*

### B.

As discussed in section IV, proof of actual reputational harm is an absolute prerequisite in a defamation action. In reviewing the record below, it is evident that Ms. Kenney's proof of actual reputational injury was tenuous at best.[3]

As in *Bauer, Taylor,* and the cases cited from other jurisdictions, Ms. Kenney made only a conclusory statement that her reputation was injured and that she felt "embarrassed, shocked, mad" because of the poster. Like the plaintiffs in those cases, Ms. Kenney did not name a single person who held her in lower regard after seeing the poster. Nor did she present anyone who respected her less or thought of her reputation as being lowered by the poster. Ms. Wyke, the only witness Ms. Kenney called who actually saw the poster, testified that it did not affect her relationship with Ms. Kenney.

Ms. Kenney's evidence of actual physical or emotional injury is equally tenuous. The entire presentation of evidence is summed up in Ms. Kenney's statement that she felt "embarrassed, shocked, mad." As in *Taylor,* Ms. Kenney did not seek "medical treatment, psychiatric or psychological counseling, nor was she treated with any medication" as a result of the poster. *Taylor,* 927 S.W.2d at 544. Ms. Kenney did visit a psychologist after the incident, but complained only about her termination from Hallmark and did not mention the Wal–Mart poster. Ms. Kenney presented no testimony or other evidence of "stress or sleeplessness over the

**3.** For an example of what might constitute proof of actual reputational injury, *see* David

A. Anderson, *Reputation, Compensation, and Proof,* 25 Wm. & Mary L.Rev. 747 (1984).

incident[ ], and apparently suffered no symptoms associated with mental distress." *Id.* There was very little, if any, evidence of "quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression." *Arthaud,* 170 F.3d at 862.

Within this issue of proof of damages, there also arises a causation issue. This is not a situation where Wal–Mart is a joint tortfeasor with KSHB–TV as to the broadcast or with Angela Miles as to the other 99 posters. Where a plaintiff's reputation has been damaged by substantially similar statements that are either true or privileged, "the untrue and unprivileged portion of the defamation is thought to add little or nothing to the harm already caused by" a substantially similar publication that is not actionable. Dobbs § 422, at 1190–91.

"If there is evidence that some of the harm might have been caused by statements that are truthful or otherwise nonactionable, the jury should be instructed that the defendant is liable only for the portion of the loss allocable to the actionable statement." David A. Anderson, *Reputation, Compensation, and Proof,* 25 WM. & MARY L.REV. 747, 773 (1984). Missouri courts agree. In *Taylor,* the court denied recovery because the plaintiff "could not differentiate between the damages, if any, attributable to the defendant and the damages attributable to [a third person]." *Taylor,* 927 S.W.2d at 544. It appears that Ms. Kenney failed to distinguish the harm from this poster from the harm resulting from the television broadcast, the other 99 identical posters, and the time the Wal–Mart poster was displayed prior to Lauren's return to her mother.

### C.

Having determined that the trial court erred in materially altering the submitted verdict director, the Court must determine whether it is appropriate to reverse the judgment and remand for a new trial or to simply reverse the judgment. Here, Wal–Mart has challenged the sufficiency of the evidence produced at trial, but judged under an erroneous instruction. As discussed above, it appears from the record that Ms. Kenney's proof was, at best, tenuous. However, whether the plaintiff made a submissible case at trial is not the test for remand.

"An appellate court should reverse a plaintiff's verdict without remand only if it is persuaded that the plaintiff could not make a submissible case on retrial. The preference is for reversal and remand." *Warren v. Paragon Tech. Group, Inc.,* 950 S.W.2d 844, 846 (Mo. banc 1997) (citing *Moss v. Nat'l Super Markets, Inc.,* 781 S.W.2d 784, 786 (Mo. banc 1989)) (internal quotation marks omitted). Normally, this type of instructional error results in remand of the case for new trial. *Lasky v. Union Elec. Co.,* 936 S.W.2d 797, 801 (Mo. banc 1997). Though Ms. Kenney may face substantial obstacles in meeting her burden of proof on retrial, this Court cannot say that it is impossible for her to present a submissible case.

### V.

The judgment of the trial court is reversed and the case is remanded for a new trial.

LIMBAUGH, C. J., WHITE, WOLFF, LAURA DENVIR STITH and TEITELMAN, JJ., and HARMAN, SP. J., concur.

BENTON, J., not participating.