

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | |
|---|---|
| MOUNA APPERSON, F/K/A NICHOLAS APPERSON, | ) No. ED112529 |
| | ) |
| | ) Appeal from the Circuit Court of |
| Appellant, | ) St. Louis County |
| | ) |
| vs. | ) |
| | ) Honorable David L. Vincent III |
| NATASHA KAMINSKY, ET AL., | ) |
| | ) |
| Respondents. | ) Filed: January 28, 2025 |

**Introduction**

Mouna Apperson ("Apperson") appeals the trial court's judgment granting Respondents Natasha Kaminsky ("Kaminsky") and Adriane Norman's ("Norman") motions for directed verdict on Apperson's defamation claims. In Points I and II, Apperson argues the trial court erred in granting Kaminsky and Norman's respective motions for directed verdict because Apperson made a submissible case in which a reasonable jury could have found Apperson suffered damage to his reputation. Point III contends the trial court erred in granting Norman's motion for directed verdict because Apperson made a submissible case in which a reasonable jury could have found Kaminsky was acting as Norman's agent because Norman publicly stated that Kaminsky was "working on my behalf[.]"

As to Points I and II, this Court holds Apperson failed to make a submissible case for his defamation claims because the only evidence presented to support the conclusion he had suffered

reputational harm was his own testimony. Regarding Point III, this Court holds Apperson failed to demonstrate a principal-agent relationship existed between Kaminsky and Norman through a single social media post.

Accordingly, the trial court's judgment is affirmed.

**Background**

Apperson dated Kaminsky from 2012 to 2013 and Norman from 2016 to 2017. On June 28, 2023, Apperson filed a second amended petition against Kaminsky and Norman alleging the following defamation claims:

Count I – claim against Kaminsky for stating Apperson is a "rapist."

Count II – claim against Kaminsky for stating Apperson is a "serial rapist."

Count III – claim against Kaminsky for stating Apperson is a "serial abuser."

Count IV – claim against Norman for stating Apperson is a "rapist."

Count V – claim against Norman for designating Kaminsky to serve as her "authorized agent" in making statements that Apperson is a "rapist."

Count VI – claim against Norman for designating Kaminsky to serve as her "authorized agent" in making statements that Apperson is a "serial rapist."

Count VII – claim against Norman for designating Kaminsky to serve as her "authorized agent" in making statements that Apperson is a "serial abuser."

Count VIII – claim against [R.B.] for stating Apperson is a "rapist" and "abuser."[1]

Count IX – claim against Norman and Kaminsky alleging Kaminsky served as Norman's "authorized agent" in sending an individual a message stating Apperson "used to brag to me about having their wealth in bitcoin[,] and that makes sense because they keep getting charged with tax evasion. [I]f they have wealth[,] it is through illegal means which is to say they are hiding wealth from the government."

Count X – claim against Kaminsky for knowing her request for a full order of protection against Apperson was denied, but still telling an individual Apperson "knows he's not allowed to come within 500 feet of me."

---

[1] Apperson made no argument related to Count VIII because R.B. was dismissed as a defendant in the underlying action.

Count XI – claim against Kaminsky for sending a message to an individual stating Apperson "threatened to kill [her] and [another person]."

Count XII – claim against Kaminsky that she falsely made a statement on social media that Apperson actively stalked her following the end of their relationship.

On January 17, 2024, a three-day trial commenced. Apperson, Kaminsky, and Norman[2] were the only witnesses that testified at trial.

### A. Apperson's Testimony

Apperson testified he met Kaminsky in the fall of 2012 on OkCupid, a dating app, and dated for approximately a year. He stated they were sexually active only once, on her birthday. During their relationship, Apperson denied ever having sexual intercourse with Kaminsky without her consent, and the first time he heard about her being raped was through a social media post.

In late November of 2017, Apperson was served with a petition wherein Kaminsky sought an order of protection against him for stalking her from 2013 to 2017. A hearing was held whereby both Kaminsky and Apperson appeared. After the hearing, the court denied Kaminsky's request for an order of protection against Apperson.

Apperson further testified at trial he became aware Kaminsky had made the following series of Facebook posts:

November 14, 2017: "Nick Apperson, the owner of Radix House[3] is run by a serial abuser and rapist of women."

November 30, 2017: "Nick Apperson, the owner of Radix House, is a serial abuser and rapist."

December 1, 2017: "[T]heir greatest asset is that house. [I]f they have wealth[,] it is through illegal means[,] which is to say they are hiding wealth from the

---

[2] We acknowledge Kaminsky and Norman gave extensive testimony regarding their relationship with Apperson. However, for purposes of this appeal, we only set forth the facts relevant to this appeal.

[3] Apperson bought Radix House in 2015 and lived there with several roommates. Radix House was set up to a be place for people who were passionate about human rights and other types of activism to live in.

3

government and that makes sense because they keep getting charged with tax evasion."

December 6, 2017: "Maybe you didn't know then[,] but you know now: [N]ick [A]pperson is a serial abuser and rapist of women."

Apperson testified his reputation had been harmed by Kaminsky. Specifically, he recounted an incident that occurred on November 16, 2017 at his house when his roommates and four other individuals confronted him about the allegations made against him. Apperson acknowledged he made the following statements at the meeting: if Kaminsky felt pressured to have sex with him, it was true; his understanding of consent had changed after his relationship with Kaminsky; and he had pressured her into a situation and he was sorry for it. Later, Apperson testified he made those statements to deescalate the situation because he was scared for his life and was saying anything to get out of the house. He stated one of his roommates told him to leave and threatened him while brandishing a gun. When he left his house, Apperson did not call the police or tell anybody he had been threatened with a gun, except for his partner at the time. He ultimately decided to leave his house for seven months. He stated he left out of his own volition and attempted to eject his roommates from the house.

Additionally, as an employee at a technology startup, LockerDome, Apperson leased a space at T-Rex, a co-working space for startups. He asserted his lease at T-Rex was terminated after Kaminsky sent an email to the president and executive director stating: "I was raped and abused by Nick Apperson who is renting office space at your organization." Despite other co-working spaces being available in the area, Apperson admitted he did not seek to lease another working space because the "start-up scene isn't huge, so there would be the same people who would have heard those lies. They would be in that same ecosystem." Apperson acknowledged he

4

continued to attend events related to his work, such as Venture Start-up Café, and did not lose his job at LockerDome as a result of any of the statements made by Kaminsky.

Apperson further testified people's actions towards him in public ranged from giving him "odd dirty looks" to "aggressively yelling" at him. As an example, he stated he could not go to his local coffee shop because someone had once approached him and told him "you're a dangerous person, you're a serial rapist."

He also stated he lost a speaking engagement opportunity regarding domestic violence with the Missouri Office of Prosecuting Services due to the allegation he was a rapist. And, his relationship with his girlfriend turned hostile after "she believed the lies." Aside from the aforementioned domestic violence speaking engagement, he stated no one had explicitly told him he could no longer participate in local community events.

Regarding the statement about tax evasion, Apperson admitted he did not suffer any harm related to that statement alone. Instead, he considered all the statements working together.

Apperson began dating Norman in April of 2016. He testified, during their relationship, Norman sent him the following text message: "I would like an apology for cumming in me without asking me, dismissing my concern after -- when I was worried because I was fertile." Apperson responded: "I'm happy to give another one. I don't want to have this conversation over text though." Apperson acknowledged he apologized via text message for ejaculating inside Norman without her consent, but denied actually ejaculating inside her without her consent.

Apperson denied being a rapist, serial rapist, and tax evader; threatening to kill Kaminsky or Norman; ejaculating inside Respondents without their consent; being charged with a sex crime, tax evasion, or any crime other than a traffic violation; and any order of protection being entered

5

against him in 2018. He maintained he was falsely accused of rape and had not been able to repair his reputation due to the statements made by Kaminsky and Norman.

*B. Kaminsky's Testimony*

Kaminsky testified she dated Apperson for roughly a year and characterized their relationship as "complicated." Kaminsky explained, throughout their relationship, Apperson had sex with her without her consent, had sex with her after she asked him to "stop," and coerced her into having sex.

Kaminsky also recounted her application for a protective order against Apperson in 2017. Kaminsky acknowledged that even though the order of protection was denied, she told an acquaintance Apperson was aware he was not allowed to come within 500 feet of her.

After the order of protection hearing, Kaminsky posted on Facebook that "Nick Apperson, the [owner] of Radix house, is a serial abuser and rapist." She also posted the following statement: "Radix house is owned and run by a serial abuser and rapist of women." Additionally, Kaminsky told someone living in Radix House that, if Apperson had wealth, it was obtained "through illegal means" and he was "hiding wealth from the government." Kaminsky admitted she now knew Apperson had not been charged with tax evasion and claimed the statement was based on "a case.net entry about a tax issue."

Throughout 2018, along with verbal statements she made to others, Kaminsky continued to post on Facebook that Apperson was a rapist, a serial rapist, and a serial abuser. In 2019, Kaminsky made another post on Facebook saying she was "actively being stalked by Apperson through 2017" and "decided to speak up about being stalked and the pattern of abuse." Kaminsky also sent an email to the head of T-Rex stating she was "raped and abused by Nick Apperson who

6

is renting office space at your organization." When asked whether she wanted T-Rex to kick Apperson out of his space and interfere with his business, Kaminsky responded, "not necessarily."

During her testimony, Kaminsky conceded that publicly stating somebody is a rapist, a serial rapist, a stalker, and a tax evader "damages that person's reputation." Kaminsky acknowledged Apperson was banned from certain establishments within the community. Kaminsky stated she "[did not] know" whether this ban was a result of her posts and messages. When asked if she had any knowledge of whether her statements actually harmed Apperson's reputation, Kaminsky stated, "no[.]"

*C. Norman's Testimony*

Norman testified she dated Apperson for just under one year. There were times during their relationship when Norman had sexual intercourse with Apperson that were "not consensual."

When detailing her experience with Apperson to people who had a personal and professional relationship with him, Norman told them he was a "rapist." Norman also stated she was aware Kaminsky published on Facebook that Apperson was a "a rapist, a serial rapist, a stalker and an abuser" and affirmed Kaminsky made the Facebook post on behalf of "all of the women."

As to the Facebook post Norman made stating Kaminsky was working on her behalf and on the behalf of other women, Norman testified she did not tell Kaminsky what to do. Norman also stated she did not direct her to make any posts on her behalf on any specific date, did not direct her to speak on her behalf, and had no control over Kaminsky. However, she was happy with the "work" Kaminsky was doing.

Regarding the statement Apperson was a rapist, Norman asserted there could be a possibility it affected his reputation, but she did not know if it affected his reputation. Norman agreed publicly stating somebody is a rapist, at the very least, can impact their reputation. She also

agreed publicly stating somebody is a serial rapist, has been charged with tax evasion, has threatened to kill you, or somebody stalked you could also damage someone's reputation, but clarified, she never made any of those statements.

At the close of Apperson's evidence, Respondents individually moved for a directed verdict, which the trial court granted.

This appeal follows.

**Standard of Review**

"In reviewing a trial court's judgment granting a motion for directed verdict, we must determine whether the plaintiff made a submissible case." *Payne v. Cunningham*, 549 S.W.3d 43, 47 (Mo. App. E.D. 2018) (citation omitted). The evidence is viewed in the light most favorable to the plaintiff, affording the plaintiff all reasonable inferences from the evidence and disregarding all contrary evidence and inferences. *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 711 (Mo. App. E.D. 2020). "A plaintiff presents a submissible case by presenting substantial evidence to establish each element of his claim." *Payne*, 549 S.W.3d at 47 (citation omitted). "Accordingly, [this Court will] affirm a trial court's grant of a directed verdict if at least one element of the plaintiff's case was not supported by the evidence." *Johnson v. City of St. Louis,* 613 S.W.3d 435, 445 (Mo. App. E.D. 2020).

"A correct decision by a trial court on a motion for directed verdict will not be disturbed on appeal merely because the trial court gave a wrong or insufficient reason." *Runny Meade Estates, Inc. v. Datapage Technologies. Int'l, Inc.*, 926 S.W.2d 167, 170 (Mo. App. E.D. 1996). This Court is concerned with "whether the trial court reached the proper result, not the route by which it reached that result." *Id*. As such, this Court is required to affirm a directed verdict on any

ground, including one not asserted by the trial court. *See Meyer v. Smith*, 298 S.W.3d 596, 597 (Mo. App. E.D. 2009).

## Discussion

### Points I & II

In Points I and II, Apperson contends the trial court erred in granting Kaminsky and Norman's motion for directed verdict because Apperson made a submissible case in which a reasonable jury could have found Apperson suffered damage to his reputation. This Court disagrees, and holds Apperson failed to put forth substantial evidence to establish the element of reputational harm of his defamation claims as to Counts I–III and X–XII against Kaminsky, and Count IV against Norman.[4]

"Defamation law protects an individual against harm to his or her reputation." *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 798 (Mo. banc 2017). To prevail on a defamation claim, a plaintiff must plead and prove: "1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Id*. (citation omitted). Apperson's appeal only takes issue with the sixth element and puts forth no argument as to the other elements. As such, our discussion focuses solely on whether Apperson submitted sufficient evidence to demonstrate damage to his reputation.

The Supreme Court of Missouri has made clear that "proof of *actual reputational harm* is an absolute prerequisite in a defamation action." *Kenney v. Wal–Mart Stores, Inc.,* 100 S.W.3d 809, 817 (Mo. banc 2003) (emphasis added). To establish actual damages, a plaintiff must proffer evidence that is not "too speculative and must be founded upon more than the plaintiff's

---

[4] Counts V, VI, VII, IX related to the principal-agent relationship between Kaminsky and Norman will be discussed in Point III.

embarrassment or perception of their own reputation." *The Fireworks Restoration Co. v. Hosto*, 371 S.W.3d 83, 87 (Mo. App. E.D. 2012).

On appeal, Apperson fails to discuss each count separately and explain how each of the statements damaged his reputation. Instead, his argument clusters his defamation counts together and asserts that, collectively, the statements damaged his reputation. To analyze the numerous counts before us, we group them together based on the allegations made and discuss them in turn.

We first address Counts I–III alleging Kaminsky published defamatory statements that Apperson is a "rapist," "serial rapist," and "serial abuser," and Count IV against Norman alleging she published defamatory statements that Apperson is a "rapist." As to Counts I–III, Apperson points to Kaminsky's admissions in her answer to Apperson's second amended petition wherein she admitted that:

> [F]alsely accusing someone of committing a sex crime negatively impacts that person's reputation; falsely accusing someone of serially committing sex crimes negatively impacts that person's reputation; falsely describing someone as a rapist negatively impacts that person's reputation; and falsely describing someone as a serial rapist negatively impacts that person's reputation. Kaminsky stood by these admissions during her testimony at trial and further admitted that the remaining statements she made about Appellant are also damaging to a person's reputation.

Apperson also highlights selective portions of the transcript in which Kaminsky affirmed publicly stating somebody is a serial rapist, rapist, stalked another, charged with tax evasion, and "accusing someone in the court of public opinion of crimes" impacts someone's reputation. Apperson states these admissions "coupled with the fact that Kaminsky flat-out admitted she made these statements, should end the inquiry."

Regarding Count IV, Apperson takes a similar approach and points to the transcript to highlight Norman's testimony affirming that "stating to a third party that somebody is a rapist, at the very least, can impact their reputation." Apperson then concludes his argument by stating,

"[l]ike Kaminsky, Norman does not dispute that [Apperson's] reputation was damaged as a result of her actions." We find both arguments without merit.[5]

As mentioned above, there are six elements to a defamation claim, and Apperson only appeals the element of reputational harm. Apperson asserts his reputation was harmed as a result of the defamatory statements made by Kaminsky and Norman. In doing so, Apperson correctly states Missouri case law, which makes clear that in order to satisfy the element of reputational harm, a plaintiff is not required to present a particular type of evidence to satisfy the element. While his recitation of Missouri case law is accurate, he fails to demonstrate how he proffered non-conclusory evidence to show reputational harm beyond his own perception of his reputation. *See Kenney*, 100 S.W.3d at 816 ("Testimony of third parties as to a diminished reputation will also suffice to prove 'actual injury.' Awards based on a plaintiff's testimony alone or on 'inferred' damages are unacceptable.") (citation and emphasis omitted). In other words, Apperson had the burden of "offer[ing] some concrete proof that his reputation has been injured." *Id*. (citation omitted).

Missouri courts have recognized and consistently applied the principles set forth above. In *Kenney v. Wal-Mart Stores, Inc*., the plaintiff alleged she felt "embarrassed, shocked, [and] mad" because of a defamatory poster the defendant made. *Id*. at 817. The Supreme Court noted the extent of the evidence she proffered consisted of conclusory statements that her reputation was injured and her feelings of how her reputation was tarnished. *Id*. The Court also noted the plaintiff was unable to name a single person who held her in lower regard and failed to present any witnesses

---

[5] Apperson further attempts to shift his burden to Kaminsky as to what elements he needed to establish at trial by pointing to Kaminsky's testimony affirming that "the only disagreement that we have [in this case] is whether what you publicly said about Mr. Apperson was true." Kaminsky's testimony affirming which elements were at issue at trial is not a stipulation or concession this Court can accept under its standard of review. To be clear, it is Apperson's – not Kaminsky's – burden to demonstrate he put forth substantial evidence to establish each element of his defamation claim against Kaminsky. *See Payne*, 549 S.W.3d at 47.

11

to support the conclusion that her reputation had been injured as a result of the defendant's defamatory actions. *Id.* Likewise, the plaintiff was unable to offer any quantifiable evidence of her alleged injury. *Id.* at 818. Thus, the Supreme Court held the plaintiff could not recover on her defamation claim. *Id.*

In *Taylor v. Chapman*, this Court similarly found the plaintiff was unable to prove actual damage to her reputation in her defamation case. 927 S.W.2d 542, 545 (Mo. App. E.D. 1996). There, the plaintiff brought a defamation action against the defendant alleging libel based on statements made in a letter the defendant wrote and delivered to all the homeowners in the condominium complex she lived in and managed. *Id.* at 544. In doing so, this Court noted that while plaintiff testified that her "integrity had been tarnished," she failed to support that conclusion and proffered no testimony from others that her reputation had been damaged. *Id.* at 544–45. Finally, the plaintiff could not "differentiate between the damages, if any, attributable to defendant and the damages attributable to [another resident]." *Id.* at 545. When asked to differentiate between the damage claimed because of the defendant's conduct and the damage claimed because of the conduct of another resident, she testified that, "[t]hey run along together." *Id.* This Court found the plaintiff was unable to identify which damages were attributable to the defendant alone because the damages, if any, were in her words, inseparable. *Id.* In affirming the trial court's grant of summary judgment, this Court held the plaintiff failed to prove actual damages in her defamation suit. *Id.*

Similar to the plaintiffs in *Kenney* and *Taylor*, Apperson failed to make a submissible case as to Counts I–III against Kaminsky and Count IV against Norman because he failed to demonstrate *actual* reputational injury. Like in *Kenney* and *Taylor*, here, the only evidence Apperson presented to satisfy the element of reputational harm was solely based on his conclusory

testimony of his perception of his injured reputation. Specifically, Apperson points to his testimony stating that, as a result of Kaminsky's statements, he had been kicked out of establishments he frequented and his own house; had lost the space he leased to work remotely;[6] was involved in an altercation with a third-party; and was denied a speaking opportunity with the Missouri Department of Prosecution. Notably, Apperson did not put forth any witnesses or other evidence to support his conclusions to show how each individual statement directly caused injury to his reputation. *See Hosto*, 371 S.W.3d at 87 (stating the evidence proffered to establish actual damages may not be too speculative and must be founded upon more than the plaintiff's perception of their own reputation); *Kenney*, 100 S.W.3d at 817 (finding plaintiff's testimony alone nor her conclusory statements that her reputation was injured suffice to prove actual injury). Additionally, like in *Taylor* where the plaintiff failed to differentiate between which statements caused reputational harm because the complained-of statements all ran together, here, Apperson similarly asserts Respondents' statements *collectively* damaged his reputation, and also points to Respondents' general admissions that certain acts, i.e., stating that somebody is a rapist, an abuser, a stalker, and a tax evader, may damage a person's reputation. This is insufficient to satisfy the reputation harm element for a defamation case.[7] Again, Apperson had the burden of showing how the statements at issue related to him, and how each, individual statement directly caused him –

---

[6] Apperson testified he lost the working space he was leasing as an employee for LockerDome due to Kaminsky sending an email to the president and executive director who managed the leasing spaces. Apperson points to Kaminsky's testimony acknowledging that he had lost his leased space after sending Kaminsky's email. However, detrimental to Apperson's argument is his failure to draw a direct connection that he did, in fact, lose his leased space because of the email. *See Kenney*, 100 S.W.3d at 818. He did not proffer a lease termination letter listing the email sent by Kaminsky as the cause for the termination of his lease or call the president of T-Rex as a witness to testify as to the reason for terminating Apperson's lease. Additionally, Apperson testified he did not attempt to locate another office space nor did Apperson lose his job with LockerDome.

[7] Apperson also asserts "[p]rior to trial, Kaminsky admitted that statements such as those made by both her and Norman damaged Appellant's reputation." However, there is no citation to the record or any showing this evidence was before the jury. "[T]his Court will not consider evidence outside the record on appeal." *Day v. Hupp*, 528 S.W.3d 400, 412 (Mo. App. E.D. 2017).

13

not "somebody" else – actual harm. *See Taylor*, 927 S.W.2d at 545; *see also Sterling v. Rust Commc'ns*, 113 S.W.3d 279, 283 (Mo. App. E.D. 2003) (stating that "in order to be defamatory, a statement must be clear as to the person addressed" and finding that the complained of statements, which refer to "deadbeats" and "professional delinquents," were general statements by a real estate professional regarding the problems inherent in the business of property rental (internal quotations and citation omitted)). More importantly, Apperson's line of questioning only confirms that making the aforementioned comments publicly *may* impact a person's reputation – not whether in the context of this case, those statements, *if false*, injured Apperson's reputation. Even though we are not addressing the veracity of the statements, if we accepted this assertion, then *any* statement made publicly about someone's character could be considered as proof of reputational damage.

As to Counts X-XII, Apperson testified his reputation was harmed by Kaminsky: telling an individual "[Apperson] knows he's not allowed to come within 500 feet of me," even though her request for a full order of protection against Apperson was denied; sending a message to an individual stating Apperson "threatened to kill [her] and [another person]"; and falsely making a statement on social media that Apperson actively stalked her following the end of their relationship. Apperson's own testimony that his reputation was injured because of these aforementioned statements was the extent of the evidence he presented. No testimony of third parties or other proof was proffered to support Apperson's conclusory assertions that the statements certainly damaged his reputation. *See Kenney*, 100 S.W.3d at 816 (stating that while a plaintiff's testimony alone is inadequate, "testimony of third parties as to a diminished reputation will … suffice to prove 'actual injury.'" (citation omitted)). It bears repeating that Respondents' general admissions in which they concede that stating someone a rapist, abuser, a stalker, and tax

evader may damage somebody's reputation is not sufficient to satisfy his burden of proof. *See Taylor*, 927 S.W.2d at 545; *see also Sterling*, 113 S.W.3d at 283.

Accordingly, Apperson's conclusory assertions his reputation was damaged as a result of Kaminsky and Norman's statements fall short of what is required to present a submissible case of defamation and reverse the trial court's directed verdict.

Points I and II are denied.

### Point III

In Point III, Apperson contends the trial court erred in granting Norman's motion for directed verdict as to Counts V–VII, and IX[8] because Apperson made a submissible case in which a reasonable jury could have found Kaminsky was acting as Norman's agent in that Norman publicly stated Kaminsky was "working on my behalf." This Court holds Norman's statement alone is insufficient to make a submissible case for agency.

"Agency is the fiduciary relationship resulting from the manifestation of consent by an agent to a principal that the agent will act on the principal's behalf and subject to his control." *Shiplet v. Copeland*, 450 S.W.3d 433, 442 (Mo. App. W.D. 2014) (quoting *Bach v. Winfield–Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008)). To establish an agency relationship, three elements must be met:

> 1) that an agent has a power to alter legal relations between the principal and a third party; 2) that an agent is a fiduciary with respect to matters that are within the scope of the agency; and 3) that a principal has the right to control the agent's conduct with respect to matters entrusted to the agent.

*Reyner v. Crawford*, 334 S.W.3d 168, 173 (Mo. App. E.D. 2011).

---

[8] This Court notes that while Apperson's point on appeal concerns Norman's motion for directed verdict, Apperson's Count IX is against both Respondents.

15

"An agency relationship arises only when the elements above are present, and the characterization of the relationship by the parties or in the context of industry or popular usage is not controlling." *Murray-Kaplan v. NEC Ins., Inc.*, 617 S.W.3d 485, 496 (Mo. App. E.D. 2021). "There are two types of agency authority: actual and apparent." *Custom Constr. Sols., LLC v. B & P Constr., Inc.*, 684 S.W.3d 148, 162 (Mo. App. E.D. 2023). "Actual authority is authority that the principal has given, either expressly or impliedly, empowering the agent to act on the principal's behalf." *Price v. Thompson*, 616 S.W.3d 301, 310 (Mo. App. W.D. 2020). "Apparent authority exists where a principal's manifestations to a third party have created a reasonable belief in the third party that an agent is acting for the principal, or where the principal is fully aware that another is acting as his agent but does nothing to correct the misconception." *Custom Constr. Sols., LLC.*, 684 S.W.3d at 162–63 (citation omitted).

Apperson asserts he made a submissible case to the jury on the question of whether Kaminsky was acting as Norman's agent because "Norman outwardly manifested to the public (the very public that was reading Kaminsky's defamatory statements) that Kaminsky was acting on her behalf." Specifically, Apperson points to a social media post made by Norman stating Kaminsky "has been working on my behalf as well as many other women." Apperson claims this evidence "is textbook evidence of agency" because "Norman not only acquiesced to Kaminsky's conduct, but also told members of the public who were reading Kaminsky's statements about [Apperson] that Kaminsky was acting on behalf of Norman." We disagree.

Detrimental to Apperson's argument is his failure to establish whether Kaminsky had express or implied agency. While we note Apperson correctly sets forth the case law discussing apparent authority, Apperson not only fails to inform this Court of which type of agency relationship he relies on to support his point on appeal, but he also fails to develop a legal argument

to provide an adequate explanation as to how the cited authority applies to his claim on appeal. Apperson's argument merely relies on bald conclusions an agency relationship existed. "Mere conclusions and the failure to develop an argument with support from legal authority preserve[s] nothing for review." *Est. of Allen*, 615 S.W.3d 851, 855 (Mo. App. E.D. 2020) (citation omitted).

Apperson relies solely on Norman's Facebook post to support an agent-principal relationship existed. However, this is grossly insufficient to establish apparent authority existed. A principal generally creates the appearance of authority in three different methods: (1) direct, express statements; (2) placing the agent in a "position" which, according to the ordinary habits of people in the locality, trade, or profession denotes a certain kind of authority; and (3) authorizing an agent to carry out "prior acts" in which the principal, by allowing an agent to carry out prior similar transactions, gives the appearance that the agent is authorized to carry out subsequent acts. *Earl v. St. Louis Univ.*, 875 S.W.2d 234, 238 (Mo. App. E.D. 1994). Here, Apperson failed to introduce any evidence demonstrating what authority, if any, Norman gave Kaminsky; if apparent authority was given to Norman, how the apparent authority arose; that Kaminsky, acting as the agent, had the power to alter legal relations between Norman and a third party; in which capacity Kaminsky was "working" for Norman; what specific matter Norman entrusted to Kaminsky; or that Norman had the right to control Kaminsky's conduct with respect to those matters entrusted to Kaminsky.

Accordingly, Apperson failed to satisfy his burden of showing he made a submissible case of his principal-agent claim.

Point III is denied.

**Conclusion**

The judgment of the trial court is affirmed.

_____
Michael S. Wright, Judge

Robert M. Clayton III, J. concurs.
John P. Torbitzky, P.J. dissents in a separate opinion.



# In the Missouri Court of Appeals
## Eastern District

### <u>DIVISION FOUR</u>

MOUNA APPERSON, F/K/A NICHOLAS )     No. ED112529
APPERSON, )
                                   )     Appeal from the Circuit Court of
      Appellant, )  St. Louis County
                                   )     Cause No. 19SL-CC00805
v. )
                                   )
NATASHA KAMINSKY, ET AL., )  Honorable David L. Vincent III
                                   )
      Respondents. )  Filed: January 28, 2025

### Dissenting Opinion

I respectfully dissent from the principal opinion's holding that Apperson failed to present evidence from which a reasonable juror could find that Apperson sustained reputational damage as a result of the numerous statements made by Kaminsky. Because Apperson presented substantial evidence, which if believed by the jury, could support his defamation claim, I would reverse the circuit court's judgment and allow the jury to determine Apperson's claim against Kaminsky.

"In reviewing the grant of a motion for directed verdict, this Court must determine whether the plaintiff made a submissible case …." *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011) (internal quote omitted). "The plaintiff may prove essential facts by circumstantial evidence as long as the facts proved and the conclusions to be drawn are of such a

nature and are so related to each other that the conclusions may be fairly inferred." *Id*. at 756 (quoting *Morrison v. St. Luke's Health Corp.,* 929 S.W.2d 898, 900 (Mo. App. 1996)). To determine whether the plaintiff made a submissible case, the evidence is viewed in the "light most favorable to the plaintiff and giv[ing] the plaintiff the benefit of all reasonable inferences while disregarding all contrary evidence and inferences." *D.R. Sherry Const., Ltd. v. Am. Fam. Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. banc 2010). This Court reviews whether the plaintiff made a submissible case *de novo*. *Johnson v. Auto Handling Corp.*, 523 S.W.3d 452, 459 (Mo. banc 2017).

The principal opinion is based on what I see as a misreading of two cases: *Taylor v. Chapman* and *Kenney v. Wal-Mart Stores*. The principal opinion reads these cases to hold that a plaintiff cannot make a submissible defamation case without third-party testimony, effectively rendering the plaintiff's testimony about reputational damage without credibility as a matter of law. Neither of these cases support that interpretation. While these cases hold that a plaintiff must present more than conclusory testimony about their own *feelings* of reputational harm, nothing in these cases renders a plaintiff unable to demonstrate damages by providing concrete examples of how the alleged defamatory statements have negatively affected the plaintiff's life.

*Taylor v. Chapman*, a case decided on summary judgment, involved a condominium manager who claimed her reputation was damaged by a letter sent by one condominium owner to all of the other owners. 927 S.W.2d 542, 544 (Mo. App. 1996). The plaintiff's only evidence of reputational harm was her own deposition testimony that "her integrity had been tarnished" and her own belief that "[p]eople lose their trust in the person that is supposed to be managing their building." *Id*. Not only did the plaintiff fail to find testimony from anyone to support this assertion, but she could not name anyone who told her they had lost trust of confidence in her as

a result of the letter. *Id*. Moreover, the plaintiff was not disciplined, did not lose her job, and "[h]er position as property manager was unaffected by defendant's actions." *Id.* at 545. In effect, the plaintiff presented no damages beyond her own subjective belief that the statements harmed her reputation.

*Kenney* similarly involved a situation when the *only* evidence of reputational damage was the plaintiff's own feeling that her reputation had been harmed. 100 S.W.3d 809, 812 (Mo. banc 2003). The plaintiff sued Wal-Mart after Wal-Mart failed to take down a poster that implied that the plaintiff had abducted her granddaughter. *Id.* at 812. At trial, the plaintiff's only evidence of reputational damage was her own conclusory statement that her reputation was hurt and that she felt "embarrassed, shocked, mad" about the poster. *Id.* at 817. The plaintiff was unable to "name a single person who held her in lower regard after seeing the poster. Nor did she present anyone who respected her less or thought of her reputation as being lowered by the poster." *Id.* Significantly, the Supreme Court noted that the plaintiff did not present any "evidence of quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression." *Id.* at 818.

It does not follow from these cases that Apperson cannot testify to the link between the alleged defamatory statements and his negative experiences with friends and acquaintances afterward. Nor does it follow that Apperson must provide corroborating testimony of the alleged incidents to close the loop between the defamation and the incidents. All these cases say is that Apperson must provide more than his subjective belief that his reputation was damaged. In my view, he has done so.

Apperson testified about concrete incidents that occurred to him based upon Kaminsky's numerous posts and messages about him, including: Apperson's speaking engagement with the

Missouri Office of Prosecution Services was canceled due to the accusation he was a serial rapist; Apperson was told he was no longer welcome to patronize the coffeeshop closest to his home; Apperson and his partner were confronted at a festival and his partner was assaulted; Apperson was told by other administrators he needed to step away from two organizations he founded; and Apperson was forcibly kicked out of his home by his roommates. Each of these incidents reflect something more than Apperson's self-perception of his reputation.

Additionally, Apperson presented evidence that Kaminky's statements caused him to lose office space, and thereby, his business was negatively impacted. The evidence supporting this claim was not merely Apperson's speculative belief that his reputation was damaged. Rather, Kaminsky testified she sent a message to the executive director of T-Rex stating that Apperson raped her and asking T-Rex to take action against him. The executive director responded, stating that T-Rex was looking into the issue. Shortly, thereafter, Apperson lost his office space at T-Rex. Apperson testified that he lost the space as a result of Kaminsky's message. This is sufficient evidence to allow a reasonable juror to decide that Kaminsky's message caused Apperson actual reputational harm. Because there was sufficient evidence from which a juror could determine Apperson suffered actual reputational harm, I believe the circuit court erred in directing a verdict in Kaminsky's favor.

I am also unpersuaded by the principal opinion's holding that Apperson failed to adequately identify which statements caused his injuries. The principal opinion's holding in this regard also stems from *Taylor* and *Kenney*. Both of those cases involved multiple defamatory statements made by different individuals. Some of the statements were potentially actionable, and others were not. The issue in those cases was that the plaintiff could not demonstrate which individual caused the alleged damage. Here, however, the only statements at issue were those

made by Kaminsky. Norman is only alleged to have acted through Kaminsky. Moreover, unlike in *Taylor* and *Kenney*, Apperson is seeking damages for every statement and has included all of the individuals involved in those statements as joint and several tortfeasors in this lawsuit. There are no unactionable statements at issue or statements made by others that are not party to this suit. As a result, any reputational damage a jury may find would be a direct result of Kaminsky's statements.

I do not disagree with the principal opinion that Apperson's case would have been stronger if a representative of T-Rex would have testified that they ejected him from his office space because of Kaminsky's message, or if plaintiff put several individuals on the stand that now held him in lesser regard. But a plaintiff is not charged with presenting the strongest possible case. Instead, a plaintiff makes a submissible case by presenting some evidence from which a reasonable juror could find in the plaintiff's favor. *See Brock v. Dunne*, 637 S.W.3d 22, 26 (Mo. banc 2021). I believe Apperson has met this minimal standard and the circuit court should not have directed a verdict.

Because Apperson presented actual evidence of reputational harm, I would reverse the judgment in favor of Kaminsky and remand for a new trial. I agree with the principal opinion, however, that Apperson failed to prove that Kaminsky was acting as Norman's agent. I agree that the portion of the judgment in favor of Norman should be affirmed.

_____
John P. Torbitzky, Judge

5